IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 5, 2008 Session

## DON DRAKE ET AL. v. JANA M. WILLIAMS, M.D., ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 05C-2513      Hamilton V. Gayden, Jr., Judge**

---

**No. M2007-00979-COA-R3-CV - Filed April 25, 2008**

---

The parents of a young man who committed suicide after being discharged from a psychiatric hospital sued the hospital and the treating psychiatrist for wrongful death. The trial court granted the defendants' motions for summary judgment on the basis that the decedent's act of suicide was an intervening, superseding cause. We reverse and remand for further proceedings.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M. S., and FRANK G. CLEMENT, JR., J., joined.

Andy Allman, Clinton L. Kelly, and F. Dulin Kelly, Hendersonville, Tennessee, for the appellants, Don Drake and Sandra Drake.

Garrett E. Asher and Emily H. Wilburn, Nashville, Tennessee, for the appellee, Jana M. Williams, M.D.

Dixie W. Cooper, Carol Elaine Davis, and Clarence James Gideon, Nashville, Tennessee, for the appellee, Centennial Medical Center/Parthenon Pavilion.

### OPINION

This case involves a tragic set of circumstances and raises difficult issues concerning a treating psychiatrist's liability for her patient's suicide after his discharge from inpatient treatment.

Eric Drake turned 24 years of age in January 2005. In November and December 2004, Eric was seen by a counselor and a psychiatrist near his home in Kentucky after his family noticed changes in his behavior. Eric did not seem like himself. He appeared withdrawn, was quiet, did not shave and was unkempt, was not eating or sleeping well, and had lost weight. The psychiatrist diagnosed a major depressive disorder, single episode, severe without psychotic features. Eric did not want to consider taking psychotropic medications and did not return to the psychiatrist for treatment after the initial evaluation. There had been an earlier incident during the past year when

Eric's brother, Ben, found him walking along the road in a distressed state. That day, Eric reportedly left work abruptly and just started walking because he heard God's voice telling him to follow.

On January 7, 2005, Eric's mother, Sandra Drake, found him sitting on the side of the bathtub in his parents' home staring into space. He stayed there for several hours and was uncommunicative. Ms. Drake called her husband, Don Drake, to come home from work. They took Eric to see Dr. Reynolds, the family physician who had treated Eric since childhood. Dr. Reynolds expressed concern about Eric and recommended further evaluation at Parthenon Pavilion. Back at home later that day, Mr. and Ms. Drake became aware that Eric had a gun in his pocket. Mr. Drake was able to get the gun away from Eric. It was Mr. Drake's gun that he kept in his night stand, usually unloaded; when Mr. Drake retrieved the gun from Eric, it had one bullet in it.

Later that day, Eric was admitted to Parthenon Pavilion under the care of Dr. Jana Williams, a psychiatrist. The next day, January 8, 2005, Dr. Williams met with Eric to perform a psychiatric evaluation. Eric told Dr. Williams about the recent incident when he got his father's gun. Dr. Williams noted some suicidal ideation with a plan to use his parent's gun. She diagnosed a major depressive disorder, single episode, severe. Her assessment of Eric's level of functioning reflected severe limitations. Eric was placed on suicide precautions, which meant that the hospital staff would check on him every 15 minutes. Dr. Williams testified in her deposition that, when she initially assessed Eric, she felt his suicide risk was low, based largely on the fact that he denied being suicidal or having plans to commit suicide. She also noted that he had no prior history of being suicidal.

According to her deposition testimony, Dr. Williams saw inpatients each morning and would look over the progress notes written by the staff before meeting with each patient. Eric was compliant with the prescribed medication schedule. On January 10, 2005, Eric began exhibiting psychotic symptoms. Staff members observed him eating a plastic fork at meal time. Dr. Williams noted "very bizarre behavior" and described Eric as "elusive, withdrawn." She concluded that Eric was having a first-break psychosis and diagnosed schizophrenia. Dr. Williams opined that Eric was "a danger to self at this time," and she started him on antipsychotic medication. Over the next few days, Eric admitted having auditory hallucinations and thought broadcasting, believing that his thoughts were being read or heard by other people. Dr. Williams testified that, "Eric became somewhat mute, odd behavior, and finally admitted to me that he thought he was hearing voices of people that he recognized and then he thought the people could read his mind and could read his thoughts." On January 12, 2005, she increased the dosage of Risperdal, an anti-psychotic medication.

Staff notes for January 13, 2005, stated that Eric received a phone call from his father but did not recognize his father's voice. That evening, he did not recognize his parents when they visited him at the hospital. On January 14, 2005, Dr. Williams spent time talking to Mr. Drake on the telephone explaining that Eric's behavior was part of his psychosis. Dr. Williams felt that Eric was more "spontaneous" and fluent in his conversation with her that day. He admitted having trouble recognizing people on the telephone. Dr. Williams felt he was making slow progress. Staff observations for later in the day included noninteraction with peers and bizarre affect. Although he denied suicidal ideations, Eric would not answer when asked whether he was having thoughts of hurting himself.

Dr. Williams was aware that Eric was not participating in many of the group therapy sessions. She stated: "If [patients] are paranoid or if they feel like other people can read their thoughts, then they tend not to want to be around other people." She opined that this did not necessarily indicate a lack of progress. Throughout his hospitalization, Eric expressed a desire to go home.

After Eric had trouble recognizing his parents, Mr. Drake requested a second opinion concerning Eric's condition. In their depositions, Mr. and Ms. Drake both expressed dissatisfaction that Dr. Williams had failed to follow through on their request to her for an evaluation by another psychiatrist. Dr. Williams testified that she had been informed of the Drakes' desire for a second opinion and that she had made the initial request for the nurses to call another psychiatrist. For some reason, the first request did not result in an appointment for a second opinion. By the time Dr. Williams learned that the first request had been unsuccessful, she felt that Eric was improving and almost ready for discharge. She did not process a second request for a referral because she did not think there was time to get a second opinion. Dr. Williams also testified that she did not feel there was a need. She assumed that a social worker had communicated this information to the family.

When she saw Eric on the morning of January 15, 2005, Dr. Williams noted continuing auditory hallucinations and thought broadcasting, with less thought blocking. He was "fairly verbal about things he wants to say but can shut down when asked about his symptoms." Dr. Williams increased the evening dose of Risperdal. On January 16, 2005, Eric was more talkative and responded "appropriately and fluently" when Dr. Williams saw him initially in his room. He admitted to some depression. Dr. Williams further noted "vague suicidal ideations; no intent while here; states the thought occurs occasionally; still psychotic but progressing slowly; positive auditory hallucinations." She felt that he was progressing; he was talking. Staff notes from later in the day indicate minimal interaction, bizarre affect, and erratic appetite and sleep patterns. Eric had not used towels since being at Parthenon; he dried off with t-shirts. The staff also noted that Eric denied auditory hallucinations and suicidal ideations, attended the groups with some participation, and appeared to enjoy a visit with his parents that evening.

On the morning of January 17, 2005, Dr. Williams noted that Eric "continues to vaguely acknowledge what he feels are auditory hallucinations but seems unsure; continues to have thought broadcasting but states, sometimes." The staff had observed odd behaviors and minimal interactions with other patients. Eric told Dr. Williams that he was preoccupied "with what to do once he gets home." He stated that "if you'd just open the door and let me go, I'd be okay." Dr. Williams noted "this is very doubtful, as the patient is still psychotic, although progressive." She again increased Risperdal. Dr. Williams felt Eric was slowly progressing because he talked with her more fluently; he was getting out in the ward more, interacting more, and going to some group meetings.

When Dr. Williams saw Eric on January 18, 2005, he was "working a puzzle with another patient; clean shaven; more verbal, appropriate responses; still with psychosis, auditory hallucinations, thought broadcasting, but overall certainly progressing." She continued his medications. Staff notes for the rest of the day indicate that Eric was "isolated to room between groups; guarded; still difficult to get answers from; eye contact still poor; did admit to suicidal

thoughts." On January 19, 2005, Dr. Williams stated that Eric was "much improved." She described him as "interacting more; still vaguely psychotic and guarded but more spontaneous."

On January 20, 2005, Dr. Williams met with the Drakes. Her notes from that meeting indicate that she educated them about psychotic disorders and talked about Eric's treatment and prognosis. Dr. Williams's notes also stated: "Eric progressing; my concern now is more so the depression, as he continues to have suicidal thoughts that come and go; he's unsure if auditory hallucinations and thought broadcasting is still present." Eric expressed uncertainty about auditory hallucinations to Dr. Williams that day. When she met with Eric on January 21, 2005, Dr. Williams noted that he was "still feeling depressed with suicidal thoughts; unable to say the degree of if he'd act on these; I feel he's confused over this and lots of things but certainly coming out of a severe psychosis." Eric refused to answer when asked by staff members if he was having hallucinations. On January 22, 2005, Eric was preoccupied with going home and finding a job; he had spent a lot of time in bed the previous day, which was his birthday. Eric did "admit depression and continues to be very unclear about the level of suicidal ideation he's having."

On January 24, 2005, Dr. Williams noted that Eric was "still depressed with vague thoughts of suicide that he feels are related to being here so long." She felt that he was "still very fragile and could easily suffer a relapse; I'm also still very concerned with the suicidal thoughts as vague as they may be now; psychosis is stabilizing." Dr. Williams felt that Eric might be ready for discharge by Thursday, which was January 27, 2005. She noted, "I don't feel that Eric should go home to his apartment but should agree to live with parents for at least a month or until he can have one to two follow-up visits."

In her deposition, Dr. Williams testified that, in deciding whether Eric was ready for discharge, she considered a number of factors, including whether "the medications are at the right dosage and he's tolerating the medications without significant side effects, that we are scheduling a meeting to talk to the family, that he agrees to live with them for a while after he's discharged, that we can begin to look at some type of follow-up care for him." She further stated that, to be ready for discharge, Eric would have to be "not psychotic, he's not exhibiting psychotic symptoms, and that he's no longer considered a suicide risk."

On January 25, 2005, Dr. Williams discussed discharge with Eric. When asked about suicidal thoughts, Eric said, "I haven't done it yet so I probably wouldn't." Staff observations for this day indicate that Eric attended group meetings. He "presented with flat affect and bland mood; he had an unkempt appearance and poor eye contact; patient was quiet with no observed peer interaction." Later in the day, Eric denied suicidal ideation and stated that he wanted to go home "because there's nothing to do." He denied hallucinations.

Dr. Williams wrote the order to discharge Eric on January 26, 2005. Her discharge diagnosis was schizophreniform disorder, ruled out paranoid schizophrenia and schizoaffective disorder. Eric's medications at discharge were Lexapro and Risperdal. The follow-up care coordinator was to arrange for outpatient psychiatric treatment and therapy. Dr. Williams testified that the Drakes requested that he be referred to Dr. Kapley, a psychiatrist in Kentucky.

In her deposition, Ms. Drake testified that Dr. Williams and the social worker told her and her husband that they needed to find a psychiatrist in Kentucky since Eric could not come back to Parthenon Pavilion if he needed to be readmitted because his insurance would not cover such a stay. Based upon what the social worker told Ms. Drake, Parthenon Pavilion had just learned at the time of Eric's discharge that his insurance company would pay for the hospitalization. According to Ms. Drake, the Parthenon Pavilion staff told her that Eric "was supposed to be in a Kentucky facility" and that "he'd been admitted there by mistake, on the insurance purposes." Mr. Drake testified that Dr. Williams had called him the Monday before Eric's discharge on Thursday to make sure Mr. Drake knew that Eric's insurance was running out. According to Mr. Drake, "she wanted me to be aware that if it ran out, someone would be responsible for the bill."

Upon his discharge, Eric stayed at his parents' home for some period of time. It appears that Eric spent some nights in his apartment with some supervision by his brother, who lived nearby in the same apartment complex, and by a friend. On February 1, 2005, Eric saw therapist James Ashby, who assessed Eric's suicide risk as being low to none because "we had spent a lot of time talking about what his plans were for that week and what his plans were for the future . . . . and he was thinking that he might go back to school and pursue nursing." Eric told Mr. Ashby that he was having some trouble with side effects from his medications and was going to speak to his psychiatrist about them. Mr. and Ms. Drake both testified that Eric was having side effects of sweaty hands, heart racing, and a facial tic. Eric told Ms. Drake on February 1, 2005, that he had called Dr. Williams's office about the side effects but had not heard back from her. Mr. Drake was with Eric when Eric called Dr. Williams's office. Dr. Williams testified that Eric called her office and was told, on January 31, 2005, to go to the emergency room or see his primary care physician if his side effects got worse.

On February 2, 2005, Eric went to see Dr. Reynolds, his primary care doctor. Dr. Reynolds observed that Eric was smiling and "looking great." He gave Eric an antibiotic for an upper respiratory infection with bronchitis. Dr. Reynolds did not note any abnormal neuropsychological findings. He felt good about Eric's progress.

The next day, February 3, 2005, Eric committed suicide.[1] He was alone at his parents' home and shot himself with the same gun his father had taken from him prior to his hospitalization. Mr. Drake had taken the bullet out of the gun and hidden the gun in the pocket of a coat in a bathroom closet.

Mr. and Ms. Drake initiated the instant wrongful death lawsuit on August 23, 2005, against Dr. Williams and Parthenon Pavilion. The Drakes allege that the defendants breached a duty of care to Eric Drake "to accurately diagnose and adequately treat him; not to release him until they were reasonably certain that his suicide risk was minimized and he would not harm himself or others; to

---

[1]Eric's suicide is a tragedy for his family and those who knew him. According to the Centers for Disease Control, "[s]uicide is the second leading cause of death among 25-34 year olds and the third leading cause of death among 15- and 24-year olds." *Suicide: Facts at A Glance*, http://www.cdc.gov/ncipc/dvp/suicide/SuicideDataSheet.pdf (last visited April 2, 2008). For all age groups, in 2004 there were over 32,000 suicides in the United States. *Id.* This equals about 89 suicides per day or one every 16 minutes. *Id.*

inform/instruct his family re suicide danger signs and safeguards; to promptly initiate the follow-up care that they had indicated was necessary for Eric Drake and which they stated they would set up for him; and to respond promptly to calls concerning the post-release problems he was having."

Depositions were taken of Mr. and Ms. Drake, Dr. Williams, Eric's brother Ben Drake, Dr. Reynolds, James Ashby, and Dr. Mullick, the psychiatrist who had seen Eric on one occasion in December 2004. Parthenon Pavilion and Dr. Williams moved for summary judgment in November 2006 and December 2006 respectively.[2] In support of her motion for summary judgment, Dr. Williams submitted her own affidavit as well as affidavits from three other physicians. The Drakes opposed the motions for summary judgment and submitted an affidavit from Dr. Joel Reisman.[3]

In a memorandum opinion filed on April 11, 2007, the trial court granted summary judgment in favor of Dr. Williams and Parthenon Pavilion. The court determined that "all of the expert affidavits are sufficient and meet the requirements of Tenn. R. Civ. P. 56." The court then went on to conclude that "Eric's suicide was a superceding, intervening cause of death."

On appeal, the Drakes argue that the trial court erred in finding that Eric's suicide was unforeseeable as a matter of law and therefore broke the chain of causation. Dr. Williams and Parthenon Pavilion argue that the affidavit of Dr. Reisman submitted by the plaintiffs was insufficient to create a genuine issue of material fact; they further assert that the trial court correctly found Eric's suicide to be a superseding, intervening cause of Eric's death. Parthenon Pavilion has also requested an award of attorney fees related to the trial and the appeal.

## STANDARD OF REVIEW

The issues were resolved in the trial court upon summary judgment. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). This court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). When reviewing the evidence, we first determine whether factual disputes exist. If a factual dispute exists, we then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993); *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

The party seeking summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that the party is entitled to judgment as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). Summary judgment should be granted at the trial court level when the undisputed facts, and the inferences reasonably drawn from the undisputed facts,

---

[2]The parties later agreed to dismiss the plaintiffs' claims of direct negligence against Parthenon Pavilion. There is still an issue as to whether Parthenon Pavilion may be vicariously liable for the acts of Dr. Williams.

[3]Dr. Reisman's deposition was not taken.

support one conclusion, which is that the party seeking summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001). The court must take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, discard all countervailing evidence, and, if there is a dispute as to any material fact or if there is any doubt as to the existence of a material fact, summary judgment cannot be granted. *Byrd v. Hall*, 847 S.W.2d at 210; *EVCO Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975). To be entitled to summary judgment, the moving party must affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that conclusively defeats the non-moving party's claim. *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000).

## ANALYSIS

### Affidavits

We will begin with an examination of the sufficiency of the affidavits presented by the parties.

Our Supreme Court has held: "[I]n those malpractice actions wherein expert testimony is required to establish negligence and proximate cause, affidavits by medical doctors which clearly and completely refute plaintiff's contention afford a proper basis for dismissal of the action on summary judgment, in the absence of proper responsive proof by affidavit or otherwise." *Bowman v. Henard*, 547 S.W.2d 527, 531 (Tenn. 1977). The first question, then, is whether the defendants' affidavits "clearly and completely refute" the plaintiffs' claim of medical malpractice and, therefore, are sufficient to shift the burden to the plaintiffs to substantiate the essential elements of their claim. To effectively refute a claim of malpractice, the defendants "must present facts rebutting the allegations of [the] complaint as to at least one of the three statutory elements for medical malpractice actions." *Fitts v. Arms*, 133 S.W.3d 187, 190 (Tenn. Ct. App. 2003).

Tenn. Code Ann. § 29-26-115(a) sets out the three elements that a plaintiff must prove through expert testimony:

(1) The recognized standard of acceptable professional practice in the profession and the speciality thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

To refute one of the statutory elements, a defendant "must simply file an expert affidavit stating that all of his care and treatment of the plaintiff met the recognized standard of acceptable

professional practice or that his treatment was not the cause of any injury to the plaintiff that plaintiff would not otherwise have suffered." *Fitts*, 133 S.W.3d at 191. In fact, a defendant may shift the burden by submitting his or her "own self-serving affidavit stating that their conduct neither violated the applicable standard of care nor caused injury to their patient that would not otherwise have occurred." *Kenyon*, 122 S.W.3d at 758.

Tenn. R. Civ. P. 56.06 provides that "[e]xpert opinion affidavits shall be governed by Tennessee Rule of Evidence 703." Tenn. R. Evid. 703 states that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." An expert's opinion must be based upon the actual facts of a particular case; an expert's opinion should be disallowed if based upon inaccurate facts. *Cole v. State*, No. 02A01-9801-BC-00004, 1998 WL 397374, *7 (Tenn. Ct. App. July 16, 1998).

In support of her motion for summary judgment, Dr. Williams submitted her own affidavit as well as affidavits from three other psychiatrists. After summarizing her treatment of Eric, Dr. Williams stated in her affidavit:

> When I discharged Eric Drake, it was done in coordination with his parents. Eric actually was discharged to the care of his parents, who agreed to watch him. Eric's parents told me that Eric could live with them.
>
> I am familiar with the recognized standard of acceptable professional practice of a psychiatrist in the Nashville, Tennessee community and similar communities as such standard presently exists and as it existed in January of 2005, when I discharged Eric Drake from Parthenon Pavilion.
>
> It is my opinion, to a reasonable degree of medical certainty, that I was correct to discharge Eric Drake from Parthenon Pavilion. To a reasonable degree of medical certainty, Eric Drake was not suicidal at the time of his discharge, and I did not release him prematurely.
>
> In everything I did concerning the care of Eric Drake, I complied with the recognized standard of acceptable professional practice of a psychiatrist in the Nashville, Tennessee community and similar communities that would apply during the time I was involved in the care of Eric Drake. No act or omission on my part caused any injury to the persons identified in the Complaint in this matter.

The other three physicians who completed affidavits in support of Dr. Williams are Dr. Greg Kyser, a psychiatrist with hospital privileges at Parthenon Pavilion; Dr. George Corvin, a North Carolina psychiatrist; and Dr. Kirby Pate, a Tennessee psychiatrist. In his affidavit, each psychiatrist set forth his qualifications and his familiarity with the "recognized standard of acceptable professional practice of a psychiatrist in the Nashville, Tennessee community and similar communities." All subsequent paragraphs of the three affidavits are identical. The physicians state that they have reviewed the Parthenon Pavilion records concerning Eric Drake; the medical records of Dr. Mullick, Dr. Reynolds, and James Ashby; the depositions of Mr. and Ms. Drake and Dr.

Williams; and Eric's suicide note. After summarizing the history of Eric's condition and Dr. Williams's treatment, the doctors state:

> Dr. Williams' assessment and treatment of Lee Eric Drake was correct. Her decision to discharge Lee Eric Drake was correct.
>
> All of my statements and opinions herein are stated to a reasonable degree of medical certainty.
>
> . . . In everything that Dr. Williams did in connection with Lee Eric Drake, she complied with the recognized standard of acceptable professional practice applicable to her. In addition, no deviation from the recognized standard of acceptable professional practice caused any injury to Mr. Lee Eric Drake.
>
> In addition, to a reasonable degree of medical certainty, Eric Drake was competent and was able to make independent choices when he decided to kill himself. Eric Drake was in full command of all faculties when he did this. The suicide note Eric left evidences that Eric was not suffering from a psychosis that compelled him to kill himself. The note demonstrates that Eric had fully thought through his actions. Eric Drake knew and understood the nature of his act of suicide and exercised his power of choice when he chose to kill himself. Eric Drake made a conscious decision to take his own life.

On their face, the defendants' affidavits refute all three of the elements described in Tenn. Code Ann. § 29-26-115(a). The affiants opine that Dr. Williams acted in accordance with the applicable standard of practice and that no action or omission on her part contributed to Eric Drake's death. In light of the available proof as to the underlying facts in this case, however, there is reason to take a closer look at the factual basis for these opinions. As quoted above, Dr. Williams's affidavit includes the following statement: "When I discharged Eric Drake, it was done in coordination with his parents. Eric actually was discharged to the care of his parents, who agreed to watch him. Eric's parents told me that Eric could live with them." In the factual summary set forth in the affidavits of the other three psychiatrists states: "Eric Drake was discharged to his parent's [sic] home on January 26, 2005 with instructions for follow-up care . . . ." All three physicians state that they reviewed the depositions of Mr. and Ms. Drake as well as the deposition of Dr. Williams. However, these depositions reveal factual disputes regarding the instructions given to the Drakes prior to Eric's discharge.

Dr. Williams testified in her deposition that she met with the Drakes on January 26, 2005, "to educate them about Eric's disorder, to make sure they understood what Eric was going to be like when he came home, to make sure that they knew of the follow-up, to make sure that they knew that I had told Eric he would have to live with them for a while, just to make sure they understood the importance of follow-up and the importance of making sure that he was with them at all times." Dr. Williams testified that she reiterated to the Drakes that "it was important that Eric be with them in their care basically twenty-four/seven until he established a relationship with his referring psychiatrist." She further testified that, although the discharge instructions did not mention a

suicide risk, she had informed the Drakes of Eric's diagnosis of schizophreniform disorder and that this diagnosis meant that "Eric was at risk of attempting suicide." Dr. Williams stated that she told the Drakes "the importance of keeping Eric in sight at all times due to suicide being a common cause of death in patients with Eric's disease process." According to her testimony, she further told them "that Eric should not go to his apartment without them." Dr. Williams also stated that she instructed the Drakes about signs of decompensation and medication side effects. She testified that she advised the Drakes that they "should remove all firearms from the house." Dr. Williams claimed that the fact that Eric's insurance coverage was about to expire did not play a role in her discharge decision.

The Drakes' deposition testimony concerning the meeting with Dr. Williams on January 26, 2005, differs from Dr. Williams's account. Both Ms. Drake and Mr. Drake denied that Dr. Williams or any other hospital staff member told them that Eric was at risk for suicide or instructed them to remove all guns from the house. They both testified that Dr. Williams told them to treat Eric as if he were recovering from major surgery. Ms. Drake testified that she and her husband were told "to watch [Eric] for the first three days at home" and that "it would be good if he lived with us for about a month." She further testified that, "[t]hey said it'd be good for the first two or three days to watch him very closely, but after that, he needed–it would be fine if he tried to resume his normal life to try to get back and–just get back into functioning, I guess." Ms. Drake testified that Dr. Williams never used the word "suicide." She stated that, "had we known he was suicidal or had suicidal tendencies when he walked out of that hospital, we certainly would have never ever left him out of our sight as parents." Mr. Drake testified that Dr. Williams advised them "to watch [Eric] pretty closely for three or four days" and to have him stay at their house "probably about a month." According to Mr. Drake, he specifically asked Dr. Williams, "Is there any chance that Eric would hurt himself?" Dr. Williams responded by asking Eric whether he would ever hurt himself. Mr. Drake testified that Eric paused and said, "Well, I haven't done it yet, so I probably wouldn't." Mr. Drake stated that he would have removed his guns from the house if he had been told to do so.

In evaluating a motion for summary judgment, "we consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor." *Godfrey*, 90 S.W.3d at 695. The depositions of Dr. Williams and the Drakes contain factual disputes concerning what Dr. Williams told the Drakes about their son's condition and what steps they needed to take to promote his recovery. Specifically, the parties disagree as to whether Dr. Williams told them that Eric was at risk for suicide, that the Drakes needed to watch Eric constantly for more than a few days, and that they needed to lock up or remove all guns. The defendants' affidavits do not specifically describe the applicable standard of practice for a psychiatrist treating and discharging a patient like Eric Drake or outline how Dr. Williams's actions accorded with that standard. Instead, the affidavits describe Eric's course of treatment at Parthenon Pavilion and then opine that Dr. Williams's treatment conformed with the standard of practice. Since the affidavits of Dr. Williams and the other three psychiatrists specifically mention the fact that Eric was discharged to the care of his parents, however, it appears that the circumstances of the discharge formed part of the basis for their opinions that Dr. Williams acted appropriately. Therefore, these factual disputes cast doubt upon the trustworthiness of the opinions of the defendants' experts.

Even if we assume that the defendants' affidavits "clearly and completely refute" at least one of the elements of the plaintiffs' claim of malpractice, thereby shifting the burden to the plaintiffs

to establish the essential elements of their claim, we have determined that the physician affidavit submitted by the plaintiffs is sufficient to establish genuine issues of material fact. Pursuant to Tenn. Code Ann. § 29-26-115(a), the plaintiffs have the burden of establishing the recognized standard of acceptable medical practice, the defendant's breach of that standard, and causation. *Fitts*, 133 S.W.3d at 191. Dr. Reisman, a Memphis psychiatrist, provided an affidavit submitted by the plaintiffs in opposition to the motions for summary judgment. In his affidavit, Dr. Reisman details his qualifications and familiarity with the "recognized standard of acceptable professional practice for a psychiatrist in a community similar to Nashville, Davidson County." Dr. Reisman then states:

> I have treated patients like Lee Eric Drake in a hospital setting like Parthenon Pavilion. A patient like Lee Eric Drake must meet certain benchmarks of treatment before release from the hospital.
>
> In my professional opinion, the recognized standard of acceptable professional practice required Dr. Williams to keep Lee Eric Drake hospitalized for a longer period of time in order to prevent his suicide. The recognized standard of acceptable professional practice required Dr. Williams to keep Lee Eric Drake hospitalized until he successfully reached the benchmarks of treatment. Dr. Williams deviated from the standard of care by releasing Lee Eric Drake prematurely.
>
> In my professional opinion, Dr. William's [sic] deviation from the standard of care was the proximate cause of Lee Eric Drake's suicide, which would not otherwise have occurred. If Dr. Williams has not prematurely released Lee Eric Drake, then he would have gotten the requisite treatment for depression and suicidal ideation. This treatment more likely than not would have prevented Lee Eric Drake from taking his own life on February 3, 2005. This means the deviation from the recognized standard of acceptable professional practice caused an injury on February 3, 2005, that would not otherwise have occurred.
>
> In my professional opinion, Dr. Williams foresaw or should have foreseen that Lee Eric Drake would commit suicide. The recognized standard of acceptable professional practice requires psychiatrists like Dr. Williams to consider suicide as a likely outcome when their patients are prematurely released from mental health care facilities like Parthenon Pavilion.
>
> If Dr. Williams did not foresee that Lee Eric Drake would commit suicide, then that failure alone is a deviation from the recognized standard of acceptable professional practice because she should have foreseen it.
>
> On February 3, 2005, Lee Eric Drake was psychotic and bereft of reason prior to his suicide.

The defendants challenge the sufficiency of Dr. Reisman's affidavit on the grounds that it is "conclusory and unreliable."[4] As the defendants point out, "mere conclusory generalizations are inadequate to place a material fact in controversy." *Cawood v. Davis*, 680 S.W.2d 795, 796-97 (Tenn. Ct. App. 1984). To satisfy the requirements of Tenn. R. Civ. P. 56, the non-moving party must "set forth specific facts, not legal conclusions." *Byrd*, 847 S.W.2d at 215. In a medical malpractice case not involving the "common knowledge" exception, a plaintiff must introduce expert testimony to establish the requisite factual elements. *Kenyon*, 122 S.W.3d at 758. We find, however, that Dr. Reisman's affidavit is not conclusory. According to Dr. Reisman, "[t]he recognized standard of acceptable professional practice required Dr. Williams to keep Lee Eric Drake hospitalized until he successfully reached the benchmarks of treatment. Dr. Williams deviated from the standard of care by releasing Lee Eric Drake prematurely." He further opines that Dr. Williams's failure to comply with the applicable standard of practice resulted in injuries that would not have occurred otherwise. Thus, Dr. Reisman addressed all three of the required elements; he identified deficiencies in Dr. Williams's conduct sufficient to show that there are genuine issues of material fact.

The defendants rely on two cases in support of their argument that a greater degree of specificity is required to create a genuine issue of material fact for trial. We find both cases distinguishable from the present case. In *Estate of Henderson v. Mire*, 955 S.W.2d 56 (Tenn. Ct. App. 1997), a physician's affidavit filed on behalf of the plaintiff stated in pertinent part that the defendants "failed to diagnose, treat or intervene to provide the plaintiff decedent with timely and competent care after receiving the results of various tests . . . ." *Mire*, 955 S.W.2d at 58. The court held that this affidavit "fails to establish the requisite facts to demonstrate that a genuine issue of material fact exists." *Id.* at 59. Specifically, the court found that the affidavit was full of conclusions and did not state "with any degree of precision, what, if anything, [the defendant physician] did wrong in his treatment of the deceased." *Id.* The affidavit did not identify what treatment should have occurred. Moreover, there was nothing in the affidavit to indicate that "as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred." *Id.* at 59-60. In the instant case, Dr. Reisman's affidavit identifies a specific deficiency in Dr. Williams's actions: releasing Eric prematurely, before he reached treatment benchmarks. While describing and discussing the treatment benchmarks would have increased the specificity of the affidavit, we cannot say that the affidavit was too vague or conclusory. Furthermore, Dr. Reisman specifically addressed the issue of causation.

The defendants also rely upon *Fair v. Fulton*, No. 03A01-9812-CV-00422, 1999 WL 486884 (Tenn. Ct. App. July 13, 1999), a case in which two physician affidavits stated that, in light of the patient's condition, "many physicians in this setting would obtain an ECG." *Id.* at *2. The physicians opined that the defendant "acted with less than or failed to act with ordinary and reasonable care in accordance with [the recognized standard of acceptable professional practice]" and that the plaintiff suffered injuries as a proximate result. *Id.* After discussing *Mire*, the *Fair* court

---

[4]The defendants do not challenge Dr. Reisman's qualifications or competency as a witness. A trial court's decision on these matters would be reviewed under the abuse of discretion standard. *Kenyon v. Handal*, 122 S.W.3d 743, 749 (Tenn. Ct. App. 2003).

concluded that the affidavits were insufficient because they "merely state the conclusion" that the defendant's actions breached the standard of care and were the proximate cause of the plaintiff's injuries. *Id.* at *3. The court determined that this conclusion was "not supported by specific acts or omissions to act and [was] not sufficient to create a genuine issue of fact." *Id.* In the present case, as discussed above, Dr. Reisman's affidavit does not merely state conclusions; he identified a specific deficiency in Dr. Williams's actions that violated the applicable standard of practice.

The defendants further argue that Dr. Reisman's affidavit is unreliable because he does not detail what records he reviewed but states only that "I have reviewed the records in this case," and because of his statement that "[m]y opinion is subject to amendment as more facts come to my attention." These statements do not suggest to this court that Dr. Reisman's affidavit is unreliable due to an inadequate factual basis. As indicated by the second quoted statement, an expert's opinion is subject to change if and when additional facts come to light. Thus, in any medical malpractice case, expert opinions may change as additional facts are revealed during discovery or at trial. Dr. Reisman's affidavit is sufficient to establish that genuine issues of material fact exist, making summary judgment improper.

The trial court did not err in determining that Dr. Reisman's affidavit was sufficient to establish the existence of genuine issues of material fact.

### Suicide as a superseding, intervening cause

The Drakes make two main arguments in opposition to the trial court's finding that Eric's suicide was a superseding, intervening cause of his death. First, the Drakes argue that the trial court erred in applying the doctrine of superseding, intervening cause without finding antecedent negligence by the defendants. Second, they argue that the trial court erred in finding that Eric's suicide was unforeseeable as a matter of law.

### (1)

As to the first argument, there is no requirement that a court make a finding of negligence prior to considering whether there is a superseding, intervening cause. Tenn. R. Civ. P. 8.05 allows a party to plead in the alternative and to "state as many separate claims or defenses as he or she has, regardless of consistency." The case cited by the Drakes in support of their argument, *Godbee v. Dimick*, 213 S.W.3d 865 (Tenn. Ct. App. 2006), involved the propriety of jury instructions on superseding, intervening cause. We find no merit to the argument that, under *Godbee,* negligence must be found before a court can consider a superseding, intervening cause.

### (2)

The Drakes' second argument presents the much more difficult issue of the application of the doctrine of superseding, intervening cause to the facts of this case.

A superseding, intervening cause relates to the element of proximate cause: a superseding, intervening cause "breaks the chain of proximate causation and thereby precludes recovery." *White*

*v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998). Proximate cause is ordinarily a question of fact for the jury. *Rains v. Bend of the River*, 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003). Summary judgment is appropriate on the issue of whether an act constitutes a superseding, intervening cause only if "the uncontroverted facts and inferences to be drawn from the facts make it clear that all reasonable persons must agree to the proper outcome." *White*, 975 S.W.2d at 529-30.

An act "which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act could have reasonably been foreseen and the conduct [of the original wrongdoer] was a substantial factor in bringing about the harm." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991). Thus, an intervening act will not cut off the liability of the original wrongdoer unless it is shown that the intervening act could not reasonably have been anticipated. *Id.* at 775. The superseding, intervening cause doctrine applies "only when the intervening act (1) was sufficient by itself to cause the injury, (2) was not reasonably foreseeable to the negligent actor, and (3) was not a normal response to the negligent actor's conduct." *Rains*, 124 S.W.3d at 593. The issue for determination here is whether Eric's suicide was foreseeable to Dr. Williams.

We have considered two key cases that deal with the foreseeability of suicide in the summary judgment context. *White v. Lawrence* was a medical malpractice case involving the suicide of Mr. White, an alcoholic who suffered from depression. *White*, 975 S.W.2d at 527. The defendant, Dr. Lawrence, was aware of Mr. White's problems with alcohol and depression and admitted that Mr. White was at risk for suicide. *Id.* Dr. Lawrence gave Mr. White's wife a prescription for Antabuse and instructed her to give this medication to Mr. White surreptitiously in his food to discourage him from drinking. *Id.* Soon after he began receiving the medication, Mr. White became ill and went to the emergency room. *Id.* Since Mr. White did not know he was taking Antabuse, he did not inform the emergency room personnel of that fact and was diagnosed as having heat exhaustion. *Id.* Four hours after leaving the emergency room, Mr. White committed suicide. *Id.* at 528. In response to Dr. Lawrence's motion for summary judgment, Ms. White submitted a physician's affidavit stating that Dr. Lawrence's actions violated the standard of care and that his actions made it reasonably foreseeable that Mr. White would commit suicide. *Id.*

In addressing the issue of whether Mr. White's suicide was a superseding, intervening cause as a matter of law, the Supreme Court cited prior cases, including *Weathers v. Pilkinton*, 754 S.W.2d 75, 78-79 (Tenn. Ct. App. 1988) (a case cited by the defendants in the present case), holding that "suicide may constitute an intervening cause if it is a willful, calculated, and deliberate act of one who has the power of choice." *White*, 975 S.W.2d at 530. The court went on, however, to elaborate a broader analytical framework:

> [T]he foreseeability or likelihood of a suicide does not necessarily depend upon the mental capacity of the deceased at the time the suicide was committed. The fact that the deceased was not insane or bereft of reason does not necessarily lead to the conclusion that the suicide, which is the purported intervening cause, is unforeseeable. As our cases dealing with proximate or legal causation have indicated, the crucial inquiry is whether the defendant's negligent conduct led to or made it reasonably foreseeable that the deceased would commit suicide. If so, the

-14-

suicide is not an intervening cause breaking the chain of legal causation. Those decisions holding to the contrary are overruled.

*Id.* at 530. Applying the foreseeability test to the facts before it, the court stated:

> [R]easonable minds could conclude that the decedent's act of suicide was a foreseeable consequence of the defendant's negligence in surreptitiously prescribing and administering the Antabuse. The record shows that leading risk factors for suicide include physical illness and depression. . . . The plaintiff presented medical proof that the decedent's suicide was reasonably foreseeable from a medical standpoint, and that the defendant's conduct was a substantial factor in bringing about the suicide. Both Dr. Pate and Dr. Smith testified that the defendant should have reasonably foreseen that secretly prescribing Antabuse to an alcoholic and depressed patient would cause severe physical problems and could cause the decedent to choose to end his life.

*Id.* The court determined that there was a jury question as to whether Mr. White's suicide was a foreseeable consequence of the defendant's negligence and overturned the judgment of the Court of Appeals granting summary judgement. *Id.* at 531-32.

The second case we consider, *Rains v. Bend of the River*, involved the death of an eighteen-year-old who committed suicide using his parents' handgun and ammunition he had purchased from a local retailer hours before his death. *Rains*, 124 S.W.3d at 584. As in *White*, the key issue was foreseeability. The court found summary judgment in favor of the retailer was proper as there was "no evidence that [the decedent's] conduct or demeanor when he purchased the ammunition should have given the clerk . . . reason to foresee or anticipate that he intended to use the ammunition to commit suicide or to misuse it in any other way." *Id.* at 595. The court found that the decedent's act of suicide was an independent, intervening cause that insulated the retailer from liability for his death. *Id.* at 596.

Especially relevant to the present case is the court's discussion in *Rains* of three exceptions to the application of the independent intervening cause doctrine in suicide cases: "(1) circumstances in which the defendant's negligence causes delirium or insanity that results in self-destructive acts . . . (2) custodial settings in which the custodian knew or had reason to know that the inmate or patient might engage in self-destructive acts . . . and (3) special relationships, such as a physician-patient relationship, when the caregiver knows or has reason to know that the patient might engage in self-destructive acts." *Id.* at 593-94 (citations omitted). The latter two exceptions have relevance in the present case. *White* is an example of the application of the third exception. In *Cockrum v. State*, 843 S.W.2d 433, 437 (Tenn. Ct. App. 1992), the court applied the second exception to prison and psychiatric settings: "In the custodial context, when the intervening act is itself the foreseeable harm that gives rise to the custodian's duty, the custodian who fails to prevent the act will not be relieved from liability simply because the act has occurred." In *Cockrum*, the court held that an inmate's suicide was foreseeable and did not constitute an independent intervening cause to shield the state from liability. *Id.* at 438; *see also Husted v. Echols*, 919 S.W.2d 43 (Tenn. Ct. App. 1995)

(holding that a jury question was presented on the issue of whether the negligence of a physician was the proximate cause of the suicide of a psychotic jail inmate).

The central issue then is whether reasonable minds could conclude that Eric's suicide was a foreseeable result of Dr. Williams's negligence in releasing him prematurely. Viewing the evidence in the light most favorable to the non-moving party, we have concluded that summary judgment was not properly granted in this case as reasonable minds could conclude that Eric's suicide was foreseeable. Dr. Reisman's affidavit includes the following statement: "Dr. Williams foresaw or should have foreseen that Lee Eric Drake would commit suicide. The recognized standard of acceptable professional practice requires psychiatrists like Dr. Williams to consider suicide as a likely outcome when their patients are prematurely released from mental health care facilities like Parthenon Pavilion." Thus, as in *White*, there is evidence that Eric's suicide was foreseeable from a medical standpoint. The deposition testimony of the Drakes and Dr. Williams also provides some support for the conclusion that Eric's suicide was foreseeable. For example, Dr. Williams testified that Eric was at higher risk for suicide because of his diagnosis and that he needed to be discharged under the close supervision of his parents until outpatient psychiatric care had been established. Eric's parents testified that they were not given proper warning or instructions concerning the supervision necessary to protect Eric.

In *Jacoves v. United Merch. Corp.*, 9 Cal.App.4th 88, 111 (Cal. Ct. App. 1992), the plaintiffs presented facts indicating that the decedent "was prematurely discharged in light of his continuing active suicidal ideation, based on improper considerations of insurance coverage, and an inappropriate reliance on his nonsuicide contract with his parents." The court reversed summary judgment in favor of the hospital, finding a triable issue of fact as to whether suicide was a superseding, intervening cause. *See also Scheidt v. Denney*, 644 So.2d 813 (La. Ct. App. 1994) (evidence could support a finding of improper discharge care and/or failure to give adequate firearms warnings).

In our opinion, there is a jury question as to whether Eric's suicide was a foreseeable result of Dr. Williams's alleged negligence. It was, therefore, improper for the trial court to find Eric's suicide to be a superseding, intervening cause of his death as a matter of law and to grant summary judgment.

In light of our decision, we deny Parthenon Pavilion's request for attorney fees.

We, therefore, reverse the decision of the trial court and remand for further proceedings. Costs of appeal are assessed against the appellees, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE