IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 25, 2011 Session

# 4215 HARDING ROAD HOMEOWNERS ASSOCIATION v. STACY HARRIS

**Appeal from the Chancery Court for Davidson County**
**No. 09-1685-II     Carol McCoy, Chancellor**

_____

**No. M2010-01467-COA-R3-CV - Filed April 15, 2011**

_____

The Homeowners' Association of a high-rise condominium building filed this action against an owner/occupant of a condominium unit alleging she was in violation of the Master Deed and Bylaws due to grossly unsanitary conditions in the defendant's unit and extremely offensive odors that emanated from her unit into common areas. The Association requested that the defendant's condominium unit be sold at a judicial sale and that it be awarded its attorneys' fees. The trial court found the defendant's acts and omissions violated the Master Deed and Bylaws and that the Association was entitled to the relief it requested; accordingly, the court ordered that the unit be sold and awarded $116,037.77 in attorneys' fees against the defendant. We affirm the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Stacy Harris, Nashville, Tennessee, Pro Se.

Darrell G. Townsend and Nicholas A. Lastra, Nashville, Tennessee, for the appellee, 4215 Harding Road Homeowners Association.

## OPINION

The plaintiff, 4215 Harding Road Homeowners' Association, is a non-profit corporation whose members are condominium unit owners of Windsor Tower Condominiums in Nashville, Tennessee. The defendant is Ms. Stacy Harris, an owner of a unit located on the first floor at Windsor Tower.

In its complaint, the Association stated that the action was filed to enforce the provisions of the Association's Master Deed and Bylaws and Rules and Regulations. Specifically, the Association alleges that Ms. Harris was in violation of the following provisions of the Master Deed and Bylaws:

- Paragraph 19 of the Master Deed stating: "The use, maintenance and operation of the Common Elements shall not be obstructed, damaged or unreasonably interfered with by an Unit Owner."

- Article 5, Section 1 of the Bylaws stating: No unlawful noxious or offensive activities shall be carried on in any Unit or elsewhere on the Property, nor shall anything be done therein or thereon which shall constitute a nuisance or which shall in the judgment of the Board cause unreasonable noise or disturbance to others. Each Unit Owner shall maintain his Unit in good condition and in good order and repair, at his own expense.

- Article 5, Section 3 of the Bylaws stating: Trash, garbage and other waste shall be kept only in sanitary containers, and shall be disposed of in a clean and sanitary manner.

- Rule 22 of the Rules and Regulations of the Association stating that residents shall not cause or permit unreasonable disturbance to others.

Pursuant to paragraph 20 of the Master Deed, the Association sought an injunction to prevent Ms. Harris from occupying or controlling the unit, for specific performance of its contractual rights, including the right to take possession of the unit, to have the unit sold, and to recover its damages, including its attorneys' fees resulting from Ms. Harris violations of her obligations under the Master Deed and Bylaws. Ms. Harris filed an answer and counter-complaint.

The facts and circumstances leading up to the commencement of this action are legion and have developed over several years; nevertheless, the most relevant began to develop in the summer of 2008. Some of the more relevant facts and circumstances are summarized below.

Martine Sanders, the interim property manager of Windsor Tower, began receiving complaints at Windsor Tower about a "noxious and offensive odor" on the first floor of the building in July 2008. She later stated that she received at least four complaints a week from residents regarding the odor. The odor was most prominent in the east wing of the first floor

of Windsor Tower, which is the area in which Ms. Harris's unit is located. Not knowing at first the cause or source of the noxious odor, Ms. Sanders had the carpets in the common area shampooed and placed air fresheners in the area, but the odor remained. When that did not work, Ms. Sanders hired a plumber to inspect the access panels to the ceiling of the first floor for leaks that could be the cause of the odor but no problems were discovered and the odor remained.

On August 26, 2008, Ms. Harris complained to the manager about a leak in her unit. When Ms. Sanders entered Ms. Harris's unit to investigate the leak, she immediately noticed a very offensive and overpowering odor inside the unit, an odor Ms. Sanders compared to the smell of rotting meat. As she walked through Ms. Harris's unit, Ms. Sanders observed extremely unsanitary conditions and piles of papers everywhere. Having determined that Ms. Harris's unit was the source of the offensive odor, Ms. Sanders informed Ms. Harris that she needed to remedy the situation.

On September 2, 2008, Ms. Sanders was replaced by Kelly Hillin, who became the full-time property manager at Windsor Tower. Ms. Hillin soon received numerous complaints regarding the odor, and one resident requested that her parking spot be relocated from the east to the west wing of the building because the odor was so offensive that she did not want to walk down the hallway in the east wing. Another resident submitted a memorandum complaining of the odor and requesting that immediate action be taken. On September 8, 2008, Ms. Hillin met with Ms. Harris and the President of the Homeowners' Association, Sally Buntin, regarding the odor and the complaints of the residents. They agreed to hire Mack Pest Control to determine the cause of the odor.

On September 9, 2008, Rob Watson from Mack Pest Control inspected Ms. Harris's unit. Afterwards, Mr. Watson submitted a work order outlining his findings stating that the odor was due to "major sanitation issues" in Ms. Harris's unit, which needed to be cleaned. Mr. Watson described the smell as strong and nauseating; he also reported there were gnats in the unit.

Following the inspection, Ms. Hillin met with Ms. Harris inside her unit. Ms. Hillin observed clutter and trash throughout the unit and gnats flying around the kitchen. She also observed that the refrigerator was filled with food and the door was open. Ms. Hillin stated the smell was overpowering and offensive, that it made her eyes water, and that she had to fight her gag reflex. Ms. Hillin offered to help Ms. Harris clean her apartment but Ms. Harris refused. She did, however, let Ms. Hillin change the filters in Ms. Harris's HVAC unit.

On September 18, 2008, the Board of the Homeowners' Association ("the Board") wrote a letter to Ms. Harris informing her of her obligations under the Maser Deed and the

Bylaws, stating that she was in violation of them, and requesting that she cure her violations within ten days. The letter requested that Ms. Harris have a professional clean her unit to eliminate the odor.

Ms. Hillin then contacted American Bio Recovery Services,[1] a professional bio-hazard cleanup company that cleans crime scenes and gross filth and hoarding situations, for assistance. On September 24, 2008, Ms. Harris allowed Richard Graf, a supervisor for American Bio Recovery Services into her unit. Mr. Graf classified Ms. Harris's unit as "a gross filth and hoarder situation" based upon the hoarding of paper, books, clothing, mail, and other items.[2] Mr. Graf also observed rotten food on the floors and furniture, cabinets covered in rotting food, and a bathroom with a buildup of scum and urine. In Mr. Graf's opinion, the odor was caused by the unsanitary conditions in Ms. Harris's unit. During the meeting with Mr. Graf, Ms. Harris agreed that her unit would be cleaned by his firm, that anything wet, molded, damaged, or retaining the odor would be thrown away, that duplicate items would be packed in boxes, and that her clothes would be placed in bags to be washed. Ms. Hillin agreed to wash Ms. Harris's clothing.

On September 25 and 26, Bio Recovery cleaned Ms. Harris's unit. Bio Recovery set off "odor bombs" inside the unit to kill airborne bacteria and reduce the odor; additional odor bombs had to be set off during the cleaning process because the odor was so intense. Three Bio Recovery employees worked nine hours the first day and fifteen hours on the second day. To facilitate the disposal of the massive amount of filthy debris, molding paper products, and rotting food that was in Ms. Harris's unit, the Homeowners' Association provided an additional commercial dumpster for Bio Recovery to utilize. Over the two-day clean up, the dumpster was filled and emptied three times with debris from Ms. Harris's unit.[3] The Association also provided a storage area in the basement to store boxed items and Ms. Hillin assisted by washing Ms. Harris's clothing. Ms. Hillin did thirty-eight loads of laundry for Ms. Harris.

Other residents at Windsor Tower also provided assistance to Ms. Harris during this process. One resident helped sort Ms. Harris's laundry. Two other residents paid for Ms. Harris to stay in a hotel room the first night and bought her dinner, and one resident allowed Ms. Harris to stay in her unit on the second night.

---

[1]It is also known as CSR Bio Recovery Services, Inc.

[2]According to Mr. Graf, a gross filth or hoarder situation is when a person stockpiles items, such as newspapers and magazines, does not dispose of anything, and does not clean up.

[3]Mr. Graf wanted to dispose of Ms. Harris's couch due to its smell, however, Ms. Harris refused.

The next phase of the clean up was to have the unit painted. Ms. Hillin assisted by obtaining bids from painters. Ms. Harris chose Mike Davidson of Handyworx. While preparing to paint the unit, Mr. Davidson discovered that Ms. Harris's curtains were covered in a black, furry, odiferous mold and the curtains were stuck to the walls. As he explained it, they had to be peeled off the walls and windows. Mold was also on the walls and windows and Mr. Davidson used bleach to clean the mold off the walls and windows before painting.

By the end of October 2008, the cleaning of Ms. Harris's unit was complete, the odor was no longer detectable in the common areas, and Ms. Hillin stopped receiving complaints from residents. Although the odor had subsided, Ms. Hillin began experiencing difficulties with Ms. Harris; she would come to Ms. Hillin's office numerous times a day with various complaints, to the point Ms. Hillin was unable to perform her other duties as property manager.

In late February, early March 2009, Ms. Hillin again received complaints from residents about a noxious odor. The initial complaints were from residents who shared the HVAC air stack with Ms. Harris. They told Ms. Hillin they smelled an offensive odor in their own units. On March 10, 2009, the Board sent Ms. Harris a letter informing her of renewed complaints. The Board also requested that she remove her boxed items from the basement storage area, which had remained for five months.[4] The following day, Ms. Hillin met with Ms. Harris to address the return of the offensive odor and she provided Ms. Harris with a copy of a complaint log listing the various complaints from other residents regarding the odor.

On March 17, 2009, Ms. Harris contacted her former painter, Mr. Davidson, and requested that he fix her dishwasher. When Mr. Davidson entered her unit, the odor was so strong and offensive that he had to cover his mouth and nose because it caused him to gag. Mr. Davidson left and asked one of his employees to perform the work, instructing him to use a face mask inside the unit when performing the repairs.

Because the extremely offensive odor had returned, the Board sent a memorandum to all Windsor Tower residents on March 18, 2009, informing them of an open forum on the issue of the offensive odor. The purpose of the open forum was to inform the residents that the Board was attempting action to remedy the situation. The memorandum did not identify Ms. Harris or her unit as the source of the odor. The forum was held on March 24, 2009. After the meeting, Ms. Hillin engaged the services of ServPro, a professional cleaning service. When she met with Rob Dixon of ServPro regarding the situation he recommended

---

[4]The letter also noted that the boxes themselves smelled of the offensive odor and asked her to place the files in plastic containers from which the smell could not escape.

they also engage the services of an air quality expert, specifically Jim LaMarr of the consulting firm Environmental Sciences. Mr. Dixon and Mr. LaMarr went to Windsor Tower on March 27, 2009, to inspect several units that shared an air stack with Ms. Harris's unit. When they attempted to inspect Ms. Harris's unit, she refused, yet they inspected the units on other floors, with Ms. Harris accompanying them. After inspecting the other units, Ms. Harris still refused to allow them to inspect her unit.

On April 8, 2009, the Board sent a letter to Ms. Harris informing her that she was in violation of the Master Deed and Bylaws by refusing to allow access to her unit for the purpose of inspection and ordering her to allow access on April 10, 2009. Ms. Harris cancelled the April 10 inspection; however, Ms. Harris permitted them to inspect her unit on April 14. On that day, Ms. Hillin and Mr. LaMarr visited Ms. Harris in her unit. Immediately upon entering, it was obvious the source of the offensive smell was from her unit. They observed piles of trash, food, newspapers, and paper all over Ms. Harris's apartment and Mr. LaMarr compared the smell in Ms. Harris's unit to rotting trash.

On April 16, 2009, Mr. LaMarr issued a report stating the odor was caused by the unsanitary conditions of Ms. Harris's apartment. The report contained several recommendations, some of the more relevant ones are as follows:

> In order to inhibit the travel of any future malodors the HVAC system for the condominium should be isolated as much as possible and the open areas to the Hallway plenum and others should be closed.

The refrigerator/freezer was overloaded with saved food and should be thoroughly cleaned out and sanitized.

> The Kitchen cabinets should cleaned and organized; discard outdated and/or questionable items. Sanitize all shelving before storing. Further inspection of the damage to the sink cabinet is recommended. The bottom may need replacing and the concrete wall resealing.

> Upholstered furniture, mattresses, linens, clothing, etc. should be professionally cleaned.

> If the malodor persists it may be necessary to clean the ceiling and walls by wiping down with green soap. It may be necessary to reseal the drywall if odors persist.

> HVAC unit and duct work should be professionally vacuumed and sanitized.

On April 28, 2009, Ms. Hillin and Board member Marilyn Lorenz met with Ms. Harris to discuss the recommendations made by Mr. LaMarr. The Board agreed to pay the cost of having Ms. Harris's plenum sealed and also offered to pay for the HVAC unit and duct work to be professionally vacuumed and sanitized if Ms. Harris agreed to complete five other recommendations.

The following day, the Board sent another letter to Ms. Harris putting her on notice that she was in violation of the Master Deed and Bylaws and requesting that she comply with the recommendations made by Mr. LaMarr to cure her violations.

In early May 2009, Ms. Harris's sister visited her and helped arrange some cleaning and for a new sink faucet, and Ms. Harris purchased a new refrigerator as recommended; however, she did not agree to perform the other, more significant recommendations.

On May 12, 2009, Rob Dixon from ServPro went to Ms. Harris's unit to begin cleaning the unit. When he arrived, Mr. Dixon observed trash, newspapers, food, and clutter all over the counters and floors. Dixon described the smell in the unit as powerful and overwhelming. His firm thoroughly cleaned the unit that day but Mr. Dixon stated the smell remained after the cleaning. ServPro also cleaned the HVAC duct work, which was paid for by the Board. The cleaning of Ms. Harris's apartment was paid for by Ms. Harris's sister.

On June 3, 2009, Ms. Hillin and Ms. Lorenz met again with Ms. Harris to discuss the remaining recommendations, including having her sofa, mattress, and clothing professionally cleaned. Ms. Harris refused.

On June 5, 2009, the Board sent another letter to Ms. Harris asking her to comply with the recommendations, specifically having her upholstered furniture, mattresses, linens, clothing, etc., professionally cleaned by June 22, 2009. Ms. Harris did not comply.

During June and July 2009, the complaints from residents increased. On July 22, 2009, Ms. Harris complained to Ms. Hillin about the temperature inside her unit; when Ms. Hillin entered the unit to investigate, she found the condition of Ms. Harris's unit to be as unsanitary as it had been in September 2008.

On July 27, 2009, a workman, Ray Hansen, came to inspect Ms. Harris's HVAC unit. While working on the unit, Mr. Hansen left the door to Ms. Harris's unit open,[5] during which time Ms. Hillin received numerous complaints from residents because the odor from Ms. Harris's unit was entering the common area. Ms. Hillin went to the unit to determine how

---

[5]Leaving the door open was standard protocol for the workman.

much longer the repair would last because of the complaints; however, upon inquiring, Ms. Harris became upset and threatened to call the police. Ms. Harris became more agitated upon discovering that Mr. Hansen had removed a screw from the door hinge to keep the door open; she began screaming in the lobby and making offensive comments. Ms. Hillin then called the police. While waiting on the police to arrive, Ms. Hillin attempted to explain to Ms. Harris that the door was not broken and the screw simply needed to be replaced. Ms. Harris calmed down prior to the arrival of the police and no action was taken by the police.

Ms. Harris continued to disrupt Ms. Hillin, constantly entering her office, even when Ms. Hillin's office door was closed and she was in meetings.

On July 30, 2009, the Association's attorney, Doug Berry, sent a letter to Ms. Harris informing her that she was in violation of the Master Deed and Bylaws and giving her ten days to cure the violations. The letter also requested that Ms. Harris stop interfering with Ms. Hillin's duties as property manager.

Another letter was sent to Ms. Harris on August 5, 2009, because Ms. Harris continued to interfere with Ms. Hillin's job performance. Two days later, on August 7, 2009, Ms. Harris sat in the lobby of Windsor Tower wearing a t-shirt with the words "I will not cease and desist" written on it and stopping residents in the building to complain of the Board's actions. As Ms. Harris's behavior continued, some residents complained that Ms. Harris was verbally harassing them and expressed concern that Ms. Harris might be dangerous.

Meanwhile, Ms. Hillin continued to receive complaints regarding the offensive odor from residents. The resident who lived across the hallway from Ms. Harris complained that the odor was detectable in her unit and that she had to place towels along the bottom of the front door to keep the odor out. She also complained that the odor was causing sinus and respiratory problems for her.

On August 13, 2009, the Board sent Ms. Harris a letter notifying her that the deadline to cure her violations had passed and that the Board would enter her unit on August 14, 2009, to allow Mr. LaMarr to inspect the unit. Ms. Harris refused to allow them to enter on that day. On August 21, 2009, Ms. Hillin unlocked Ms. Harris's unit and allowed Mr. LaMarr to observe the unit from the hallway. The offensive odor was still present.

On August 30, 2009, the Association's attorney sent Ms. Harris a letter informing her that she was in violation of the Master Deed and Bylaws, that she had failed to cure these violations, and that it was going to take legal action pursuant to the provisions in the Master Deed. The following day, the Association filed this action against Ms. Harris asserting, *inter*

*alia*, that her acts and omissions were in violation of paragraph 19 of the Master Deed; Article 5, Section 1 of the Bylaws; Article 5, Section 3 of the Bylaws; and Rule 22 of the Rules and Regulations of the Association. The Association requested the court provide it with the relief set forth in paragraph 20 of the Master Deed, including damages, an injunction, specific performance, and the right to sell the unit for violation of the provisions of the Master Deed and Bylaws. The Association also sought to recover its costs, including attorneys' fees, and other fees incurred in the litigation as provided in paragraph 20 of the Master Deed. Ms. Harris filed an answer and counter-complaint.

On October 26, 2009, Ms. Harris filed a motion for Chancellor McCoy to recuse herself. Attached to the motion was an affidavit by Ms. Harris in which she stated that she had made uncomplimentary remarks to the chancellor following a previous lawsuit over which the chancellor presided. Another judge, Chancellor Perkins, was asked to hear the motion. Chancellor Perkins found that there was nothing to suggest any bias on the part of Chancellor McCoy. Thereafter, Chancellor McCoy stated that she did not remember the incident Ms. Harris addressed in her affidavit. On December 3, 2009, Chancellor McCoy denied the motion.

Pursuant to an order entered on October 29, 2010, the case was set for trial on January 19, 2010. On December 15, 2009, Ms. Harris filed an untimely motion for summary judgment. Pursuant to local rules of practice for motions for summary judgment, Ms. Harris's motion could not be heard before February 5, 2010. The case was tried on January 12, 2010, before the motion could be timely considered; thus, the motion was not heard.

On January 19, 2010, a four-day trial commenced. The Association called numerous witnesses including residents, the two property managers (Ms. Sanders and Ms. Hillin), and several of the cleaning professionals, contractors, and others who participated in the cleaning of the conditions in Ms. Harris's unit, to provide evidence of the unsanitary conditions in Ms. Harris's unit and the numerous efforts undertaken to assist Ms. Harris to remedy the problems. Ms. Harris, who represented herself, only called one witness, herself.

On February 19, 2010, the trial court entered an order finding Ms. Harris in violation of the Master Deed and Bylaws for failing to abate the odor, for her uncivil behavior and offensive comments to other unit owners and Board members, and for her creation of the unsanitary conditions giving rise to the odor. The court granted declaratory relief, terminating Ms. Harris's right to occupy, use, and control her unit; however, the court suspended enforcement of the judgment to give Ms. Harris 30 days to either voluntarily vacate the premises or to take immediate steps to abate the odor. The court awarded the Association a

judgment for its attorneys' fees as authorized in paragraph 20 of the Master Deed. The court also reserved judgment on the Association's request for a judicial sale of the unit for thirty days.

On April 1, 2010, the Association filed a motion to enforce the court's declaratory judgment contending that Ms. Harris had not vacated the premises or taken steps to abate the odor. On April 23, 2010, a hearing was held, after which the court issued an order finding that the declaratory judgment should be enforced and ordering a judicial sale of the unit. The court also awarded attorneys' fees in the amount of $116,032.77.

Ms. Harris filed a Motion for New Trial or Motion to Alter or Amend, which the trial court denied in an order entered June 28, 2010. Ms. Harris filed a timely appeal.

## ANALYSIS

On appeal, Ms. Harris raises numerous issues regarding the actions and findings of the trial court. Her main arguments are that the enforcement of the provisions of the Master Deed and the resulting requirement that her property be sold by a judicial sale constitutes an unconstitutional taking of her property and that the evidence preponderates against the trial court's decision. We shall address these issues and the others issues raised by Ms. Harris in turn.

## STANDARD OF REVIEW

The standard of review of a trial court's findings of fact is de novo, and we presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Id.*; *see also The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Where the trial court does not make findings of fact, there is no presumption of correctness, and "we must conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999). We also give great weight to a trial court's determinations of credibility of witnesses. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). Issues of law are reviewed de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

# I.
## VIOLATIONS OF THE MASTER DEED AND BYLAWS

Ms. Harris insists the evidence in the record preponderates against the trial court's finding that she was in violation of the Master Deed and Bylaws. Throughout her brief, Ms. Harris insists that there was "not one scintilla of proof" that she was the cause of the offensive odor at Windsor Tower. The trial court, however, found "overwhelming" evidence that Ms. Harris's unit was the source of the offensive odor in Windsor Tower and we agree with the trial court's finding; thus, the evidence does not preponderate against this finding by the trial court.

The Association presented the testimony of numerous credible witnesses who described the odor in Ms. Harris's unit and the grossly unsanitary conditions in graphic terms, such as: offensive, noxious, overwhelming and that the odor in her unit smelled like rotten meat. Witnesses also testified that the odor was so strong, foul, and offensive that it caused them to gag and it burned their eyes. Others explained that mold was growing on the windows, walls, and curtains and that some of the curtains were stuck to the walls.

Moreover, the property manager and the Board made several genuine and credible attempts to help Ms. Harris eliminate the source and causes of the overwhelmingly offensive odor by hiring experts to identify the source of the odor and to make recommendations to remedy the situation, by removing rotting papers and debris (three dumpster loads), professionally cleaning the carpets of the building and her unit, and having the building's HVAC system inspected, cleaned, and modified. One expert, Jim LaMarr, who was qualified as an expert in the field of environmental sciences and indoor and outdoor air quality inspections, testified that the conditions in Ms. Harris's unit gave rise to the odor. Also significant in the testimony presented at trial regarding Ms. Harris being the source of the odor was the testimony that the odor was significantly abated following the intensive cleaning of Ms. Harris's unit in late 2008. However, in spring 2009, the odor reappeared when clutter, debris, and wholly unsanitary conditions once again existed inside Ms. Harris's unit.

The evidence fully supports the finding that Ms. Harris's unit was the source of the grossly offensive odors that permeated the common area on numerous occasions, and that Ms. Harris's irresponsible acts and omissions continued, not over a period of weeks or months, but for several years. Based upon the above evidence, we have concluded that Ms. Harris's behavior toward the building manager and other residents obstructed, damaged, or unreasonably interfered with the use, maintenance, and operation of the common elements in violation of paragraph 19 of the Master Deed. We have also concluded that the noxious and offensive odor in her unit that spread elsewhere on the property constituted a nuisance,

which caused unreasonable disturbance to others and, thus, was a violation of Article 5, Section 1 of the Bylaws. Further, we have concluded that Ms. Harris failed to properly and timely dispose of trash, garbage, and other waste, which created a grossly unsanitary condition in her unit in violation of Article 5, Section 3 of the Bylaws, and that she repeatedly caused unreasonable disturbances to others in violation of Rule 22 of the Rules and Regulations of the Association.

## II.
### JUDICIAL SALE OF THE PROPERTY

Ms. Harris contends that the provision of the Master Deed allowing the judicial sale of her property as a remedy for violations of the Master Deed and Bylaws amounts to an unconstitutional taking of her property. She contends it is actually an eminent domain action and the Association is not a governmental entity and, thus, it has no right to "take" her property without just compensation. We find no merit to this contention.

Paragraph 20 of the Master Deed provides:

In the event of any violation of the provisions of the Act, Master Deed, By-Laws or rules and regulations of the Board or Association by an Unit Owner (either by his own conduct or by the conduct of any other Occupant of his Unit) the Association, or its successors or assigns, or the Board or its agent, shall have each and all of the rights and remedies which may be provided for in the Act, Master Deed, By-Laws, or said rules and regulations, or which may be available at law or in equity, and may prosecute an action or other proceedings against such defaulting Unit Owner and/or others for enforcement of any lien and the appointment of a receiver for the Unit and ownership interest of such Unit Owner, or for damages or injunction or specific performance, or for judgment for payment of money and collection thereon or the right to take possession of the Unit and to sell the same as provided in Paragraph 10(b) and as provided hereinafter in this Paragraph 20, or for any combination of remedies, or for any other relief. . . Any and all such rights and remedies may be exercised at any time and from time to time, cumulatively or otherwise, by the Board.

* * *

*If any Unit Owner* (either by his own conduct or the conduct of any other Occupant of his Unit) *shall violate* the Act, or *any of the covenants or restrictions or provisions of this Master Deed or the regulations adopted by*

-12-

*the Board, and it such default or violation shall continue for ten (10) days after notice to the Unit Owner in writing from the Board, or shall occur repeatedly during any ten (10) day period after such written notice or request to cure such violation from the Board*, then the Board shall have the power to issue to said defaulting Owner a notice in writing terminating the rights of the said defaulting Owner to continue as a Unit Owner and to continue to occupy, use or control his Unit, and *thereupon an action in equity may be filed against such defaulting Owner or Occupant, or in the alternative, for a decree declaring the termination of such defaulting Owner's right to occupy, use or control the Unit owned by him on account of said violation, and ordering that all the right, title and interest of said defaulting Owner in the Property shall be sold (subject to the lien of any existing deed or trust or mortgage) at a judicial sale upon such notice and terms as the court shall determine, except that the court shall enjoin and restrain the said defaulting Owner from reacquiring his interest at such judicial sale. The proceeds of any such judicial sale shall first be paid to discharge court costs, court reporter charges, reasonable attorneys' fees and all other expenses of the proceeding and sale, and all such items shall be taxed against said defaulting Owner in said decree. Any balance of proceeds, after satisfaction of such charges and any unpaid assessments here on any liens, shall be paid to said defaulting Owner.*

(Emphasis added). Such an obligation in a Master Deed and Bylaws is an encumbrance on a resident's unit to which the resident has notice when the unit is purchased. *See Harris v. 4215 Harding Road Homeowners' Ass'n*, 74 S.W.3d 359, 361 (Tenn. Ct. App. 2001) (citing *Ass'n of Owners of Regency Park v. Thomasson*, 878 S.W.2d 560 (Tenn. Ct. App. 1994)).

Contrary to Ms. Harris's assertion, this is not an eminent domain action, it is a contract action,[6] and pursuant to the contract, specifically the provision in the Master Deed quoted above, the net proceeds from the sale of her unit are to be paid to Ms. Harris, subject to the right of the Association to recover expenses and attorneys' fees incurred in the litigation. Accordingly, the eminent domain cases relied upon by Ms. Harris are not relevant to the issues in this action.

Ms. Harris also contends the Master Deed and Bylaws create a forfeiture that should not be allowed. She relies upon *Knapp v. Robbins Properties, Inc.*, 1985 WL 4912 (Tenn. Ct. App. 1995), for the proposition that a forfeiture should not be allowed in this action. We

---

[6]Ms. Harris also asserts that this is a nuisance action and that the trial court applied the incorrect standard. We disagree. Although the trial court commented that this action is *similar* to a nuisance action in the final order, it is abundantly clear that her ruling was based upon the provisions of the Master Deed.

find her reliance on *Knapp* is misplaced because that case dealt with a conditional sales contract and the forfeiture of the sale based upon the nonpayment of a mere $280 in dues. In that case, the trial court correctly found that a forfeiture was not warranted based on the facts of the case because only $280 was at issue and the bylaws of the association, which were incorporated into the master deed, gave rise to a lien for the debt at issue. *Id.* at *2.

In this case, the trial court correctly found that a judicial sale of the unit was the appropriate remedy for several reasons, including Ms. Harris's continual denial that any odor existed, the Association's repeated and generous efforts over more than a year to help remedy the problem, Ms. Harris's continuing failure to remedy the situation, and the gravity of the nuisance created by Ms. Harris and its impact on the other residents.[7] We find no reason to disturb the trial court's order of the judicial sale as the remedy is expressly provided in the Master Deed, and under the unique circumstances of this case, is clearly the only remedy that will cure the problem created by Ms. Harris.

III.

OTHER ISSUES

Ms. Harris raises three additional issues, each of which relates to a motion she filed. First, Ms. Harris contends that the trial court erred in failing to grant her motion for recusal. Ms. Harris's motion for recusal was based upon statements Ms. Harris made to the chancellor following previous litigation.

Whether a trial judge should grant a motion for recusal is within the discretion of the trial judge. *Bean v. Bailey*, 280 S.W.3d 798, 805 (Tenn. 2009) (citing *Bd. of Prof'l Responsibility v. Slavin*, 145 S.W.3d 538, 546 (Tenn. 2004)). "Such a decision 'will not be reversed unless a clear abuse [of discretion] appears on the face of the record.'" *Id.* (quoting *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001) (alteration in original)). "[A] trial court has abused its discretion only when the trial court has applied an incorrect legal standard, or has reached a decision which is illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

---

[7]In fact, the trial court gave Ms. Harris one last opportunity to cure her violations by staying the judgment for thirty days following the entry of the order. As this was not a nuisance action, the court was under no obligation to provide Ms. Harris with this opportunity. While Ms. Harris complains that the trial court "left the fox guarding the chicken coop" because the Homeowners' Association was left to determine if Ms. Harris had cured the violation, we see nothing wrong with this provision as the court had clearly ruled in the Homeowners' Association's favor. Also, the court held a hearing on the issue and clearly found the Homeowners' Association's assertions that the violation had not been cured credible. A trial court's findings of fact are afforded a presumption of correctness, Tenn. R. App. P. 13(d), and, we find nothing to disturb them.

The chancellor stated that she had no recollection of the earlier case or the incident to which Ms. Harris referred in her affidavit. The chancellor also stated that after conducting "a personal and independent review of the papers and her conscience and the issue of reasonable impartiality," she found that recusal was not necessary. Ms. Harris does not contend that there was any actual prejudice or bias in the proceedings and we find no basis in law or fact to disturb the trial court's discretionary ruling in denying the motion for recusal.

Second, Ms. Harris contends that the trial court erred in failing to hear and decide her motion for summary judgment. We find no error because the motion was not timely filed. Ms. Harris did not file her motion for summary judgment until December 15, 2009; the trial was set to begin on January 19, 2010. Pursuant to the Local Rules of the Twentieth Judicial District Local, her motion for summary judgment could not be heard prior to the trial date; thus, it was not timely filed. The Association also notes that there was no prejudice to her as she was allowed to present the same arguments during the trial.

We also note that trial courts have broad discretion with respect to the enforcement of local rules, *see Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. Ct. App. 1983), and there is no error to be found here. The only error was the untimely filing of the motion by Ms. Harris.

Finally Ms. Harris contends that the trial court erred in overruling her motion for new trial and/or motion to alter or amend. The only grounds asserted for the motion for new trial or motion to alter or amend are the issues thoroughly addressed in this opinion to which we have found no merit. Thus, we find that the trial court did not abuse its discretion in denying Ms. Harris's motion.

IV.
ATTORNEYS' FEES

Ms. Harris contends that the trial court erred in awarding the Association its attorneys' fees. She does not argue that the Association is not entitled to attorneys' fees, and she does not challenge the reasonableness of the hourly rate. Instead, she contends the Association should not recover any of its attorneys' fees that were incurred after she made a settlement offer on September 8, 2009. She states she offered to either mediate the disagreement or to pay $2,000 to settle the manner provided the Association dropped its case against her and agreed not to pursue it again. Ms. Harris cites no law to support this contention and we find no merit to the argument.

As the prevailing party, the Association is contractually entitled, pursuant to paragraph 20 of the Master Deed, to recover its reasonable and necessary attorneys' fees. We have determined the services of the attorneys were necessary to pursue this action and the reasonableness of the fees are not disputed; therefore, we affirm the award of attorneys' fees.

The Association has also requested to recover its expenses and attorneys' fees incurred on appeal. It prevailed on appeal and is entitled to recover its expenses and attorneys' fees incurred on appeal; therefore, we remand this issue to the trial court to make the appropriate award.

### IN CONCLUSION

The judgment of the trial court is affirmed in all respects, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellant, Stacy Harris.

_____
FRANK G. CLEMENT, JR., JUDGE