Hugh COCKRUM, Plaintiff/Appellant,

v.

STATE of Tennessee,
Defendant/Appellee.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Aug. 19, 1992.

Permission to Appeal Denied by
Supreme Court Dec. 7, 1992.

Phillip L. Davidson, Nashville, for plaintiff/appellant.

Charles W. Burson, Atty. Gen., and Reporter William N. Bates, Asst. Atty. Gen., Nashville, for defendant/appellee.

## OPINION

KOCH, Judge.

This appeal involves an inmate who committed suicide while incarcerated at the Deberry Correctional Institute. Her husband filed a claim with the Tennessee Claims Commission alleging that negligent supervision was the proximate cause of his wife's death. The claims commissioner denied the claim, finding that the inmate's suicide was, as a matter of law, the intervening, superseding cause of her death and alternatively that the institution's supervision of the inmate was not negligent. The inmate's husband has appealed, asserting that her suicide was foreseeable and that the institution was negligent because it permitted his wife to obtain and ingest enough medication to cause her death. We have determined that the claims commissioner erred by determining that the inmate's suicide was the independent, superseding cause of her death. However, we have also determined that the inmate's husband has failed to prove that the institution negligently supervised his wife.

### I.

Leona Cockrum's first felony conviction occurred in 1973 when she was 23–years–old. As a result of this conviction, as well as others in 1979, 1980, and 1983, she spent

most of her remaining years in custody. Her 1983 convictions for kidnapping, grand larceny, and habitual criminality resulted in a life sentence without the possibility of parole until 2013.

Ms. Cockrum arrived at the Tennessee Prison for Women on November 16, 1983. She remained there only one day before being transferred to the Deberry Correctional Institute ("Deberry"), a facility for special needs offenders, because of "depression and suicidal thoughts." She remained at Deberry until her death almost four years later.

Ms. Cockrum remained withdrawn and asocial during most of her stay at Deberry. The length of her sentence and the health of her husband who was incarcerated at the Morgan County Regional Correctional Facility weighed heavily on her mind. She complained consistently of depression, nervousness, insomnia, and the hopelessness of her situation.

Her conduct at Deberry was also self-destructive. She burned herself with cigarettes and cut herself with sharp objects on several occasions. She also repeatedly discussed committing suicide and in April 1985 actually attempted suicide by taking an overdose of prescription medicine. The staff at Deberry viewed her as a suicide risk and placed her on suicide watch on several occasions.

The medical staff at Deberry treated Ms. Cockrum with various psychotropic drugs including Elavil, an antidepressant with sedative side effects. They stopped prescribing Elavil in December 1985 and completely discontinued using all psychotropic drugs in April 1987 because they appeared to be doing more harm than good.

In December 1985, one of Ms. Cockrum's counselors entered into a "mental health contract" with Ms. Cockrum to encourage her to participate in counseling and therapy and to become more actively involved in prison life. Knowing of Ms. Cockrum's strong attachment to her husband, the counselor promised that she could telephone her husband once a month as long as she attended counseling and therapy, became more involved in prison life, and stopped engaging in self-destructive behavior.

Ms. Cockrum checked herself into voluntary segregation in September 1986 because of unspecified fears about other inmates. A psychiatric assessment conducted in April 1987 while she was in segregation concluded that Ms. Cockrum was "prone to manipulation, suicide threats, and to exploitation of her 'helpless situation' possibly for self-aggrandizement." She was placed on a suicide watch in June 1987 but was removed several days later when she requested to be removed from segregation.

In September 1987, one of Ms. Cockrum's counselors tried to arrange for her to visit her husband as part of her therapy. Ms. Cockrum was aware of the efforts and inquired frequently into the status of the request. The visit was not immediately approved, and later in September, Ms. Cockrum stopped her individual counseling sessions and apparently either cut her arms or tried to burn herself with a cigarette.

Ms. Cockrum became less and less communicative in October 1987. One of her counselors became concerned that she might again be contemplating suicide and on November 4, 1987, placed her under increased observation and recommended further clinical intervention. On November 5, 1987, the counselor also informed Ms. Cockrum that she would no longer be permitted to telephone her husband since she had violated her "mental health contract." This news enraged Ms. Cockrum, but she had calmed down sufficiently by November 9, 1987 to be removed from increased observation status.

Deberry's treatment staff reviewed Ms. Cockrum's case on November 9, 1987 to determine what her treatment options were. Ms. Cockrum refused to cooperate with them, and since she was refusing treatment, the staff recommended that she should be returned to the general population at the women's prison. Ms. Cockrum was informed of the staff's recommendation that she be transferred from Deberry.

Ms. Cockrum somehow obtained forty 100 mg. Elavil tablets and ingested them sometime during the early morning hours of November 12, 1987. She told a guard what she had done at approximately 3:35 a.m. and was rushed to Hubbard Hospital in Nashville where she died from an overdose of Elavil at 12:20 p.m.

## II.

■ This case requires us to consider again whether a prisoner's suicide is, as a matter of law, an intervening, superseding cause sufficient to shield the State from liability for negligently supervising the prisoner. Notwithstanding our earlier decisions, the State and the claims commissioner continue to insist that a prisoner's suicide should always shield the State from liability unless the prisoner is "in a frenzy" when he or she takes her own life. We take this occasion to reiterate that the rule of *Lancaster v. Montesi*, 216 Tenn. 50, 55–56, 390 S.W.2d 217, 221 (1965) does not apply in custodial settings.

■ Prison officials have a duty to exercise ordinary and reasonable care for the protection of the persons in their custody. *Kane v. State*, App. No. 89–75–II, slip op. at 4, 14 T.A.M. 51–8, 1989 WL 136963 (Tenn.Ct.App. Nov. 15, 1989); *Langley v. Metropolitan Gov't*, App. No. 87–323–II, slip op. at 12, 13 T.A.M. 51–3, 1988 WL 123001 (Tenn.Ct.App. Nov. 18, 1988). The scope of this duty does not generally extend to protecting prisoners from self-inflicted injury or death. *Lucas v. City of Long Beach*, 60 Cal.App.3d 341, 131 Cal. Rptr. 470, 474 (1976); *Delasky v. Village of Hinsdale*, 109 Ill.App.3d 976, 65 Ill.Dec. 454, 457–58, 441 N.E.2d 367, 370–71 (1982); *Pretty on Top v. Hardin*, 182 Mont. 311, 597 P.2d 58, 60–61 (1979). However, it can be expanded to include self-inflicted injury or death when the prison officials know or should know that the prisoner might harm himself or herself. *Mack v. Knox County*, C.A. No. 1293, slip op. at 8, 14 T.A.M. 42–3,

1989 WL 105653 (Tenn.Ct.App. Sept. 13, 1989), *perm. app. denied* (Tenn. Jan. 2, 1990); *Kane v. State, supra,* slip op. at 5.

An apparent majority of other jurisdictions have reached the same conclusion. Thus, in both prison and psychiatric hospital settings, the courts consistently hold that custodians have a duty to protect prisoners or patients from reasonably foreseeable self-destructive acts. *Kanayurak v. North Slope Borough*, 677 P.2d 893, 897 (Alaska 1984); *Guice v. Enfinger*, 389 So.2d 270, 271 (Fla.Dist.Ct.App.1980); *Brandvain v. Ridgeview Inst.*, 188 Ga.App. 106, 372 S.E.2d 265, 273 (1988); *Figueroa v. State*, 61 Haw. 369, 604 P.2d 1198, 1203 (1979); *Hickey v. Zezulka*, 177 Mich.App. 606, 443 N.W.2d 180, 186 (1989); *Krieg v. Massey*, 239 Mont. 469, 781 P.2d 277, 279 (1989); *Cygan v. City of New York*, 165 A.D.2d 58, 566 N.Y.S.2d 232, 238 (1991); *Horne v. Beason*, 285 S.C. 518, 331 S.E.2d 342, 344 (1985).

The State has never taken issue directly with our recognition of a heightened standard of care with regard to foreseeable self-destructive acts. However, it continues to attempt to deflect liability by arguing that the self-destructive act itself should be viewed as an intervening, superseding cause. We respectfully disagree.

The State's position is based upon a series of cases involving persons who were not in custody. These cases held that the act of suicide was an intervening, independent cause if the decedent knew and understood the nature of his or her act or if the act resulted from a moderately intelligent power of choice. *Lancaster v. Montesi*, 216 Tenn. at 58, 390 S.W.2d at 221; *Weathers v. Pilkinton*, 754 S.W.2d 75, 78 (Tenn.Ct. App.1988).[1] However, this court has now recognized that this rule is not necessarily appropriate in custodial settings involving penal or psychiatric institutions. *See Gemmell v. Vanderbilt Child & Adolescent Psychiatric Hosp., Ltd.*, App. No. 01–A–

---

1. The practical application of this rule is hampered by the difficulty of determining a person's state of mind when they commit suicide. The State's psychiatrist testified that it was "impossi-ble" to know what was going through a person's mind at the time they decided to take their own life.

01–9110–CV–00394, slip op. at 3–4, 17 T.A.M. 29–8, 1992 WL 141015 (Tenn.Ct. App. June 24, 1992) (psychiatric hospital); *Kane v. State, supra,* slip op. at 5–6 (state prison).

 In the custodial context, when the intervening act is itself the foreseeable harm that gives rise to the custodian's duty, the custodian who fails to prevent the act will not be relieved from liability simply because the act has occurred. *Rich v. Peninsula Psychiatric Hosp., Inc.,* C.A. No. 171, slip op. at 15, 15 T.A.M. 20–6, 1990 WL 38552 (Tenn.Ct.App. April 6, 1990), *perm. app. denied* (Tenn. Aug. 6, 1990) (psychiatric hospital); *Mack v. Knox County, supra,* slip op. at 8–9 (county workhouse); *Kane v. State, supra,* slip op. at 5–6 (state prison); *Langley v. Metropolitan Gov't, supra,* slip op. at 14–16 (jail inmate). Therefore, self-destructive acts should not always be viewed as independent, intervening acts that relieve the original negligent actors from liability.

The evidence in this case demonstrates that the Deberry staff knew or should have known that Ms. Cockrum was capable of self-destructive acts. She was sent to Deberry because of her "suicidal thoughts." During her four-year incarceration there, Ms. Cockrum repeatedly injured herself and openly discussed committing suicide. On one occasion, she even attempted suicide by taking an overdose of prescription medications.

Ms. Cockrum's conduct caused the staff to place her under increased observation on several occasions, the most recent episode occurring only days before she took her own life. Her conduct during the month prior to her suicide prompted one of her counselors to believe that she might commit suicide and to recommend to Deberry's associate warden for treatment that Ms. Cockrum receive more direct clinical attention.

Several of the mental health professionals treating Ms. Cockrum concluded that her self-injurious acts and suicide threats were only manipulative, attention-getting devices. They also knew that her behavior became more stable after she was permitted monthly telephone conversations with her husband. Yet, during the week leading up to her death, they informed Ms. Cockrum that they had decided not only to discontinue her telephone calls but also to transfer her back to the women's prison.

In light of her past history and conduct while at Deberry, the staff knew or should have known that discontinuing her telephone calls and transferring her to the women's prison could have prompted Ms. Cockrum to attempt to harm herself in retaliation. Accordingly, we find that they had a duty to take reasonable precautions to protect Ms. Cockrum from injuring herself.

### III.

 Our conclusions that Ms. Cockrum's self-destructive acts were foreseeable and that her actions alone will not shield the State from liability do not end the inquiry. Like any other plaintiff in a negligence case, Mr. Cockrum cannot prevail without proving that the Deberry staff breached its duty to Ms. Cockrum and that the staff's breach of duty was the proximate cause of Ms. Cockrum's death. Mr. Cockrum's proof, such as it is, completely fails to demonstrate a breach of duty or that the staff's action was the proximate cause of his wife's death.

Mr. Cockrum's case is skeletal at best. It consists merely of unfocused examinations and cross-examinations of various Deberry employees concerning their dealings with Ms. Cockrum. It did not include any authoritative proof concerning Deberry's policies and procedures for dealing with prisoners·like Ms. Cockrum, the adequacy of these procedures, or whether these procedures were followed in Ms. Cockrum's case. Mr. Cockrum's lawyer did not even put on proof concerning how Ms. Cockrum obtained the Elavil tablets that caused her death.[2]

---

2. Mr. Cockrum's lawyer attempted to obtain a copy of Deberry's investigative report concerning this incident but apparently abandoned his efforts when the State moved for a protective

We have pieced together from the record that Deberry's procedures call for heightened precautions whenever the treatment staff determined that additional precautions were necessary in order to protect the inmate from self-inflicted injury. These precautions included increased observation, cell searches, increased restraints, increased medication, removal of potentially harmful objects, and the use of paper clothing. What the record lacks is any proof concerning the criteria for determining when these precautions should be used or concerning whether the staff acted unreasonably by not imposing any or all of these restraints after November 9, 1987.

Prison officials are not insurers of a prisoner's safety. *Figueroa v. State,* 604 P.2d at 1205; *Pretty on Top v. Hardin,* 597 P.2d at 60–61. In a case such as this one, their conduct must only be reasonably commensurate with the inmate's known condition. *See Stokes v. Leung,* 651 S.W.2d 704, 708 (Tenn.Ct.App.1982). Except in the most obvious cases, whether the prison officials acted reasonably to protect a prisoner's safety requires expert proof or other supporting evidence. *Hughes v. District of Columbia,* 425 A.2d 1299, 1303 (D.C.App.1981).

The Deberry staff's conduct in this case was not so clearly improper that claims commissioners or appellate judges can conclude that the staff breached any duty it owed to Ms. Cockrum. Accordingly, expert proof delineating the precise scope of the staff's duty and evaluating the adequacy of the staff's conduct was necessary. Mr. Cockrum cannot recover without it.

Apparently sensing the weakness of his case, Mr. Cockrum's lawyer argues that the mere fact that Ms. Cockrum was able to obtain and ingest forty Elavil tab-

lets is sufficient to make out a claim for negligence. We disagree. The doctrine of res ipsa loquitur is not available when the agency causing the injury is not under the defendant's exclusive control, *Coca–Cola Bottling Works v. Sullivan,* 178 Tenn. 405, 416–17, 158 S.W.2d 721, 726 (1942), or when the injury could occur even without the defendant's negligence. *Brown v. University Nursing Home, Inc.,* 496 S.W.2d 503, 509 (Tenn.Ct.App.1972).

Contraband finds its way into prisons notwithstanding the institution's best efforts to keep it out. Thus, we are not prepared to hold as a matter of law that Ms. Cockrum could only have obtained the Elavil because of the institution's negligence. Without proof concerning how Ms. Cockrum obtained the Elavil, we have no basis to conclude that the medication was ever under the institution's exclusive control.

### IV.

We affirm the claims commissioner's dismissal of this claim because Mr. Cockrum failed to prove that the State was negligent in its care, custody, or control of Ms. Cockrum during her incarceration at Deberry Correctional Institute. We remand this case to the commission and tax the costs of this appeal to Mr. Cockrum and his surety for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.

order. The record contains no indication that the claims commissioner ever acted on the State's motion or that Mr. Cockrum's lawyer made any other effort to obtain or to introduce this evidence. Since he did not pursue this issue before the claims commission and has not raised it as an issue on appeal, Mr. Cockrum has effectively placed this issue beyond the court's reach.