IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 2, 2001

# DEAN KINNINGHAM v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. 20001559**

---

**No. M2001-00495-COA-R3-CV - Filed September 18, 2001**

---

Appellant was an inmate housed at Riverbend Maximum Security Institution, having been transferred to this secure facility after overpowering a guard and forcibly escaping confinement at Claiborne County Jail. He was convicted and sentences imposed upon him for aggravated robbery, aggravated burglary, possession of a Schedule II controlled substance for sale, possession of a handgun by convicted felon and felony escape, these sentences being imposed on August 3, 1999. Appellant was assaulted by a fellow inmate and filed claim against the State for alleged negligent custody or control of persons resulting in the inmate attack. The Claims Commission rendered summary judgment for the State and we affirm.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee Claims Commission Affirmed

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S. and PATRICIA J. COTTRELL, J., joined.

Dean Kinningham, Whiteville, Tennessee, Pro Se.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Dawn Jordan, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

## OPINION

Dean Kinningham was convicted on August 3, 1999 of aggravated robbery, aggravated burglary, possession of a Schedule II controlled substance for sale, possession of a handgun by a convicted felon and felony escape. He had been arrested and was awaiting trial in the Claiborne County Jail when he overpowered a guard and escaped. Upon recapture, he was transferred to Riverbend Maximum Security Institution for safekeeping until his eventual conviction and sentencing.

While housed at Riverbend on November 14,1999, Kinningham was taken from his cell and escorted to the recreation area. There are six recreation cages in the recreation area, each separated by a fence. After Kinningham was placed in his recreation cage, another inmate named Hodges was placed in an adjacent recreation cage. After approximately twenty minutes in his recreation cage, Kinningham asked the guards, Rendon and Simmons, to escort him back to his cell for the purpose of using the restroom. He was taken from his rec cage and as he passed the adjacent rec cage housing inmate Hodges, he was informed by Hodges that Hodges had a pack of tobacco for him. Kinningham turned to the escorting officers to ask them if he could get the tobacco whereupon inmate Hodges, suddenly and without warning, grabbed Kinningham and cut his arm.

The Claims Commission granted summary judgment for the State and Claimant appeals.

No presumption of correctness attaches to decisions granting summary judgment because they involve only questions of law. Thus, on appeal, we must make a fresh determination concerning whether the requirements of Rule 56 T.R.C.P. have been met. *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991).

This case parallels the decision of this Court in *Carl Hanks v. State of Tennessee*, 1999 WL 454459 (Tenn. Ct. App.). In *Hanks*, this Court observed:

> *3 T.C.A. § 9-8-307(c) provides that "[T]he determination of the state's liability in tort shall be based on the traditional tort concepts of duty and the reasonably prudent person's standard of care." Therefore, the burden of proof is upon Hanks to establish that his injuries were caused by the negligence of the State. To do that, the appellant must prove the following elements: (1) a duty of care owed by the State to the claimant; (2) conduct falling below the applicable standard of care owed by the State to the claimant; (3) injury or loss; (4) causation in fact and (5) proximate cause. *Shouse v. Otis*, 224 Tenn. 1, 448 S.W.2d 673, 676 (Tenn. 1969); *Hastings v. Smith*, 223 Tenn. 142, 443 S.W.2d 436, 438 (Tenn. 1969).
>
> In this case, there has been no showing that the State breached its duty to exercise ordinary and reasonable care. As established in *Cockrum v. State*, 843 S.W.2d 433, 436 (Tenn. App. 1992), prison officials are not insurers of a prisoner's safety. In a case such as this, the conduct of the prison officials must be commensurate with the prisoner's known condition. *Id.* In *Gillespie v. Metropolitan Govt.*, No. 01A01-9109-CV-00317 (Tenn. Ct. App. Jan. 24, 1992), the Middle Section of this Court also held that penal institutions are not insurers of an inmate's safety in regard to inmate-on-inmate assaults.
>
> The general rule is that penal institutions have a duty to use reasonable and ordinary care to prevent foreseeable attacks on inmates by other inmates. The penal institution breaches this duty when its authorities know of or have reason to anticipate an attack and do not use reasonable care to prevent it. Generally speaking,

there must be some prior notice of an attack. *Gillespie, supra; Harris v. State*, 61 N.J. 585, 297 A.2d 561, 563 (N.J. 1972).

1999 WL 454459, *3 (Tenn. Ct. App.).

In deposition, Claimant testified:

Q.      About halfway down the first page, you indicate that on November 14, 1999, at 11:30 a.m. I was taken out of my cell and escorted to the recreation area at Riverbend Maximum Security Institution, Unit No. 3; is that correct?
A.      Okay, ma'am.
Q.      You go on to say, I was out there for about 20 minutes; is that about correct?
A.      Yes, ma'am.
Q.      You go further to say, when I got the urge to use the restroom, I had to be escorted back to my cell by two correctional officers; is that correct?
A.      Yes, ma'am.
Q.      And those two correctional officers were Officer Rendon and Officer Simmons; is that right?
A.      Yes, ma'am.
Q.      You also state, I asked Officer A.P. Rendon to please take me back in so I could use the restroom; is that correct?
A.      Yes, ma'am.
Q.      Officer Rendon then called for assistance to help escort you back to your cell, correct?
A.      Yes, ma'am.
Q.      At that time Corporal Simmons came out to assist Officer Rendon to escort you back to your cell, correct?
A.      Yes, ma'am.
Q.      And the two officers placed you in handcuffs; is that right?
A.      Yes, ma'am.
Q.      And then Officer Rendon opened the recreation cage gate and told you to walk through the gate; is that right?
A.      Yes, ma'am.
Q.      You were then escorted back to your cell and as you passed by Inmate Allen Hodge[s], who was in another recreation cage, Inmate Hodges said to you that he had a pack of tobacco for you; is that correct?
A.      Here's a pack of tobacco I owe you.
Q.      Okay. So Inmate Hodges told you that he had a pack of tobacco that he owed you; is that correct?
A.      Yes, ma'am.
Q.      And Inmate Hodges was essentially asking you to come back to his recreation cage so that you could get the pack of tobacco; is that correct?

-3-

A. No, ma'am.

Q. Could you explain that?

A. Well, the cages was set up. There was three cages, a total of six cages out there. There's three on each side and there's a concrete wall that's blocked up, three out. I was in the back cage. Mr. Hodges was in the middle cage. There was another inmate in the first cage up here.

When the officers come to get me, to let me out and handcuffed me, they told me to walk through. I got by Hodges' cage - - passing Hodges' cage and here's a half bag of tobacco I owe you.

So I turned around and asked Mr. Rendon to get it because I can't accept nothing from another inmate. We're not supposed to. I asked Mr. Rendon was it okay. That's when it happened.

Q. So essentially after Inmate Hodges told you that he had a pack of tobacco that he owed you, you asked Officer Rendon if you could go back and get it?

A. No. I asked Officer Rendon if he - - could I have it.

See, my cage is like this. Here is the walkway right here. Here is Hodges. This is mine - - me. I come out the gate here. Here is his cage right there. Mr. Rendon told me to walk through the gate. I got to right here. Hodges - - here is the half pack of tobacco I owe you.

I turned to Rendon to get the tobacco from him, to see if I could get it. When I turned, that's when he rescued me in the slots because I was looking in the walkway, he rescued me and grabs me by the cuffs and jerks me up. I didn't know it was cuffed at the time.

. . .

Q. And going on with your complaint here, you state that you stopped and turned to the two correctional officers who were escorting you and asked their permission to get the tobacco from Inmate Hodges and they said I could, correct?

A. Yes, ma'am.

Q. But when - - like you had said, but when you turned around to speak to the two officers, Inmate Hodges grabbed you by the handcuffs and pulled you to the recreation cage and cut you two times on the inner part of your lower arm?

A. Yes, ma'am.

Q. You go on to say, it happened so fast I could not respond; is that correct?

A. Correct.

Q. So in other words, you did not expect this attack?

A. Absolutely not.

Q. And before this incident occurred, you and Inmate Hodges had got along pretty well?

A. Fairly well. Fairly well.

Q. A good relationship.

-4-

A.      Fairly well.  I felt sorry for the man.  The man is not - - he can't read or write and he has seizures, and he's really messed up, Mr. Hodges is.  His mental capacity is going on and everything else.

Q.      And prior to the incident there were no incapables between you and Mr. Hodges?

A.      Absolutely not.

Confronted with Claimant's own testimony, the Claims Commissioner held:

Finally, with regard to Claimant's complaints about the method of escort, Defendant submits that Claimant has not raised any issues.  In Claimant's own pleadings, he states that, as he passed Mr. Hodges rec cage, he stopped and asked the officers if he could obtain a package of tobacco from Mr. Hodges. [Claimant's Amended Pleadings].  It was at that moment that Mr. Hodges reached through the flap and grabbed Claimant. [Id.].  The officers conducting the escort can hardly be blamed for the incident, particularly given the fact that the attack was sudden and totally unexpected.  Claimant and Mr. Hodges had a good relationship prior to the incident.

Thus, the Claims Commissioner correctly held that Claimant had offered no proof that the State had any notice that Hodges posed any threat of harm to Kinningham and, indeed, that Kinningham himself had no notice of potential harm.

We affirm the action of the Claims Commission in granting summary judgment to the State.

Costs of this cause are assessed against Claimant for which execution may issue.


_____
WILLIAM B. CAIN, JUDGE