IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 20, 2014 Session

JOHN PAYNE AS NEXT OF KIN ON BEHALF OF THE LEGAL MINOR
HEIRS OF MARCUS K. PAYNE v. TIPTON COUNTY, TENNESSEE

Direct Appeal from the Circuit Court for Tipton County
No. 6191    Joe H. Walker, III, Judge

No. W2013-01421-COA-R3-CV - Filed March 31, 2014

This is a negligence case filed against Tipton County for injuries an inmate sustained as a result of a severe hypertensive crisis that occurred while he was confined in the Tipton County jail. The trial court denied the claim, finding that Tipton County did not breach the duty of care. Based on the evidence in the record, we reverse the decision of the trial court and remand this matter for consideration of damages. Reversed and remanded.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Danese K. Banks and Ursula Y. Holmes, Memphis, Tennessee, for the appellant, John Payne, as next of kin on behalf of the legal minor heirs of Marcus K. Payne.

Brandon O. Gibson and Jon A. York, Jackson, Tennessee, for the appellee, Tipton County, Tennessee.

OPINION

I. Background

Plaintiff Marcus K. Payne was booked at the Tipton County jail on March 1, 2004. Official Tipton County jail policy requires a physical exam to be performed on all inmates within fourteen days of booking:

> (4) During the intake process, the inmate will be screened for any serious illness, comatose state, obvious wounds, and prescribed medications. This will be logged during the intake process. Any bruises, cuts, or obvious injury will be fully documented. . . .

> \* \* \*

> (7) A more complete examination shall be completed on prisoners within fourteen (14) days of their initial confinement date. This examination shall be performed by a physician or a person who has been designated by a physician as capable of performing such examination. If a designee performs the examination he/she must do so under supervision of a physician and with a protocol or set of instructions and guidelines from the physician.

The above policy is in accord with the official Rules of Tennessee Corrections Institute, discussed in more detail, *infra*. However, Tipton County did not follow the above procedure with regard to Mr. Payne's booking in March 2004. Instead, Mr. Payne received no physical examination of any kind within fourteen (14) days of his booking on March 1, 2004. According to later testimony at trial, the Tipton County jail operated under an unwritten policy at intake that did not require a physical examination if one had been performed by the jail in the last year. However, this policy was not officially documented by the Tipton County jail until June 1, 2004, which was after Mr. Payne's March 1, 2004 arrest. Mr. Payne had previously been booked into the Tipton County jail in July of 2003, less than one year prior to his March 2004 arrest. The jail physician performed a physical exam on July 31, 2003. Thus, under this purported policy, Mr. Payne was not required to undergo another physical exam in March 2004.

At Mr. Payne's July 31, 2003 physical exam, Mr. Payne's blood pressure was checked. Blood pressure readings of 184/122 and 168/118 were noted on the full physical form by the jail physician. The full physical form contained a note that said "HTN" and recommended lifestyle modifications. Otherwise, the full physical form noted that Mr. Payne was a "healthy male." When Mr. Payne was booked into jail in March 2004, he was asked a series of questions about his health, which were noted on a medical intake sheet. When

asked whether he suffered from high blood pressure, Mr. Payne indicated that he did not. Mr. Payne did not divulge any other health problems at the time of his arrest.

On April 22, 2004, while still in the custody of the Tipton County jail, Mr. Payne began to complain of headaches. Ultimately, Mr. Payne was given ibuprofen and sent back to the general population, referred to by Tipton County jail employees as the "pod." Mr. Payne's headache pain continued, however, prompting Sergeant Brenda Marbry to eventually fill out a request for Mr. Payne to receive medical attention from the jail physician.

Mr. Payne's condition did not improve. In fact, his condition deteriorated, and at some point, he began to complain of nausea and blurred vision, in addition to severe headaches. By April 26, 2004, Mr. Payne was prescribed migraine medicine, though the prescription may not have been dispensed to Mr. Payne as it was prescribed and/or Mr. Payne on occasion may have refused to take it. It is disputed as to whether Mr. Payne actually saw a physician on this day. While documents in the record purport to show that Mr. Payne did see a physician on this day, Mr. Payne disputes that he ever saw a physician while in the jail. Regardless, it is undisputed that Mr. Payne's blood pressure was not taken on April 26, 2004.

On April 29, 2004, Mr. Payne made a second medical request, complaining of headaches and vision problems. Mr. Payne was subsequently moved to a holding cell for observation; Mr. Payne's blood pressure was still not taken at this time. According to jail records, Mr. Payne attempted to return to the pod, but the jail officers required that he stay in isolation where he could be observed. In his later testimony, however, Mr. Payne denied that he ever requested to return to the pod. Mr. Payne's father also testified that he learned that his son was experiencing medical problems, and came to the jail at that time, but he was told his son was not undergoing a medical emergency and that he could not be seen.

Early on April 30, 2004, while still in observation, Mr. Payne complained to jail officers of dizziness and loss of vision. Officer Jonathan Hartsfield was directed to check on Mr. Payne. According to Officer Hartsfield's testimony, he checked Mr. Payne's vision and found that Mr. Payne "really couldn't see." At around 9:30 on the morning on April 30, 2004, Officer Hartsfield proceeded to take Mr. Payne's blood pressure. According to Officer Hartsfield , Mr. Payne's blood pressure was 169/91 at that time. Officer Hartsfield later testified that he understood that this reading meant that Mr. Payne's blood pressure was "high." Based on these results, another officer was directed to transport Mr. Payne to the local emergency room at approximately 9:56 a.m. After arriving at the emergency room, Mr. Payne was examined and began to have seizures. He was then flown by helicopter to a Memphis hospital, where he learned he suffered from renal failure, a stroke, heart attack, hemorrhage on his brain, anemia, seizures, kidney failure and other conditions. At the time he presented at the local emergency room, he "actually suffered from literally every known

manifestation of target organ damage" and was hospitalized for forty-five days.

On July 31, 2006, Mr. Payne timely filed this negligence suit against the Defendant/Appellant Tipton County ("Tipton County").[1] In his complaint, Mr. Payne sought damages for pain and suffering, medical expenses,[2] physical injuries, and mental anguish in the amount of $1,000,000.00 based on Tipton County's alleged negligence. A bench trial occurred on May 3, 2013.

Dr. Richard Sobel, a board certified physician with considerable experience with correctional facility medical care, testified on behalf of Mr. Payne. Dr. Sobel based his opinions on a review of the documentary evidence in the record, as well as the testimony at trial. According to Dr. Sobel, Mr. Payne's blood pressure was checked by the jail physician during a previous incarceration on July 31, 2003. The first check showed that Mr. Payne's blood pressure was 184/122. A recheck showed his blood pressure to be 168/118. The jail physician neither prescribed, nor recommended medication; instead, the only recommendation contained on the physician physical form was for "lifestyle modifications."

Dr. Sobel testified, however, that Mr. Payne's blood pressure at that time indicated severe uncontrolled hypertension and that lifestyle modification was not a sufficient intervention. Instead, Dr. Sobel testified that the physician should have prescribed medication to control Mr. Payne's hypertension. Dr. Sobel further testified that he was not surprised that Mr. Payne indicated that he did not have high blood pressure on his intake form in March 2004 because hypertension can often be outwardly asymptomatic until a crisis occurs. Dr. Sobel also stated that because the jail physician did not perform a physical on Mr. Payne within fourteen days of his confinement in March of 2004, the jail was not in compliance with its own standards regarding access to medical care. Further, Dr. Sobel opined that the jail staff's failure to take Mr. Payne's blood pressure when he complained of a headache was unreasonable because "it's well known . . . by a layperson that uncontrolled hypertension can be associated with severe headaches." Dr. Sobel testified that it was unreasonable not to attach or consider Mr. Payne's prior blood pressure readings when the sick call request form was completed. In addition, Dr. Sobel testified that despite testimony to the contrary, he saw no indications in the documentary evidence that Mr. Payne was ever seen by a physician on

---

[1] Mr. Payne originally filed his negligence suit in federal court on April 28, 2005. The federal district court dismissed Mr. Payne's state law claims on July 12, 2006, declining to exercise supplemental jurisdiction. Pursuant to federal law, Mr. Payne refiled his state law claims in state court within thirty days of the dismissal. There is no dispute that Mr. Payne timely filed his complaint in the Tipton County Circuit Court and that his claim is not barred by any statute of limitations.

[2] It is undisputed that Tipton County paid the medical bills associated with Mr. Payne's forty-five day hospitalization, totaling approximately $250,000.00.

April 26, 2004, nor were any tests of any kind conducted, despite the fact that Mr. Payne was alleged to have received a prescription on that day. Further, Dr. Sobel testified that the prescription given to Mr. Payne, Midrian, is contraindicated in cases of hypertension, and can in fact "exacerbate" hypertension if given incorrectly. Dr. Sobel also testified that based on his examination of the medication log contained in the record, the Midrian was dispensed incorrectly by jail officers.

According to Dr. Sobel, by at least April 29, 2004, when Mr. Payne complained of severe headaches, nausea, and blurred vision, the situation called for emergency medical intervention. However, Dr. Sobel testified that nothing in the record indicated that these complaints were relayed to the jail physician. Dr. Sobel further opined that had a physical been performed in accordance with the established policy, Mr. Payne's blood pressure would have been taken prior to his medical crisis, the blood pressure would most likely have been elevated, and that "earlier intervention more likely than not and within a reasonable medical certainty would have improved his kidney outcome."

On cross-examination, however, Dr. Sobel admitted that the form containing Mr. Payne's earlier high blood pressure readings did not contain any information providing any specific warnings about hypertension or placing Mr. Payne on medication. Further, although the abbreviation "HTN" was used on the form, which Dr. Sobel testified meant that Mr. Payne had been diagnosed with hypertension, the word "hypertension" never appeared on the form. Indeed, Dr. Sobel admitted that the physician also indicated that Mr. Payne was a "healthy male." Dr. Sobel further admitted that nothing in Mr. Payne's intake form from his March 2004 arrest put the jail staff on notice of Mr. Payne's hypertension. However, Dr. Sobel testified that even without the jail physician prescribing any specific plan or medication for Mr. Payne, the jail staff should have known to give Mr. Payne "chronic treatment" for hypertension. Further, Dr. Sobel testified that his standard of care would require that jail staff understand that Mr. Payne's prior blood pressure levels indicated "severe uncontrolled hypertension," even though that statement was never made by the examining physician or communicated in any way to the jail staff. Dr. Sobel also admitted that nothing in the record indicated that Mr. Payne ever mentioned anything to jail staff about his elevated blood pressure. Dr. Sobel explained that he did not believe that Mr. Payne knew that he had high blood pressure. Dr. Sobel also admitted that Mr. Payne was provided with "some access" to medical care when he made his initial complaint of a headache on April 22, 2004. Dr. Sobel testified, however, that Mr. Payne was not again allowed access to appropriate medical care until he was transported to the hospital, as Dr. Sobel testified that "medical access" in this situation required "a face-to-face examination" with a physician or physician's assistant. Dr. Sobel also opined that any problems with Mr. Payne's memory were likely the result of his hypertensive crisis, as he required an operation to relieve pressure on his brain. Dr. Sobel also explained why Mr. Payne may have asked to go to the pod,

stating that during the hypertensive crisis, Mr. Payne may also not have been completely aware and in control of his actions. Dr. Sobel finally testified that Mr. Payne's hypertensive crisis began on April 22, 2004, and that Tipton County's failure to properly diagnose and treat him for approximately eight days thereafter were the proximate cause of his injuries.

No physician testified on behalf of Tipton County, either as the treating jail physician or as an expert. Instead, Sergeant Brenda Marbry testified regarding the events at issue in this case. At the time these events took place, Sergeant Marbry was considered a top Sergeant with the Tipton County jail. However, after the events at issue in this case, Sergeant Marbry was eventually demoted, after several incidents, which Captain John Mitchell, Sergeant Marbry's superior, testified showed "poor judgment" on Sergeant Marbry's part. Sergeant Marbry first testified that it was official jail procedure to decline to conduct a physical on an inmate if they had previously had a physical within the last year, unless the inmate specifically requested the physical. Sergeant Marbry testified that an inmate's complaint of a headache would be categorized as "nonemergent," and, therefore would require only observation and a request to see the doctor. Captain Mitchell testified that inmates would often complain of headaches as a ruse for special treatment, and that, as such, an initial headache complaint was not considered an emergency situation, or even a situation requiring examination from the jail physician. Sergeant Marbry further testified that blurred vision was also nonemergent, "until a blood pressure could be taken." However Sergeant Marbry testified that in the event of an inmate complaining of both a headache and blurred vision, a blood pressure reading should be taken "as soon as possible."

With regard to the events at issue, Sergeant Marbry testified that Mr. Payne first complained to her of headaches, which was the first complaint she had ever received regarding headaches from Mr. Payne. In response to his complaint, Sergeant Marbry gave Mr. Payne ibuprofen. Sergeant Marbry testified that after Mr. Payne had complained several times regarding his headache over a period of several days, she put in a request for Mr. Payne to see the jail physician. Sergeant Marbry testified that she made this request at least four days after Mr. Payne's initial complaint, or on or after April 26, 2004.

The record contains a request for medical attention regarding Mr. Payne, which appears to be dated April 22, 2004. The form states that: "I do hereby state that I did see the nurse/doctor," and is purported to be signed by Mr. Payne. Mr. Payne, however denies that he signed the form or that he saw the jail physician at any time while confined. The form also contains the name and information of another inmate. According to Sergeant Marbry, the request for medical attention forms are returned to her after the jail physician has triaged the requests. In looking over the inmate files that were returned to her, Sergeant Marbry noticed that the notes on the form purporting to be from the jail physician pertained to Mr. Payne, rather than the inmate whose name was originally on the form. Accordingly, Sergeant Marbry

hand-wrote Mr. Payne's name on the form and put the form in Mr. Payne's file. Sergeant Marbry noted that the form contained in the record was not the original request for medical attention form that she submitted on Mr. Payne's behalf. The original request for medical attention form is not contained in the record.

There is no testimony from jail officers that Mr. Payne was physically examined by the jail physician at anytime during his confinement. Sergeant Marbry testified that although an officer took Mr. Payne to see the jail physician at some time during his confinement, the jail physician did not actually examine Mr. Payne, but simply wrote the prescription after Sergeant Marbry informed the physician that Mr. Payne was experiencing headaches and/or migraines. Sergeant Marbry testified that she was not aware if Mr. Payne had been taken to see the jail physician prior to that episode. No other jail officers testified that they observed Mr. Payne being examined by the jail physician at anytime between April 22, 2004 and April 30, 2004. In addition, Tipton County offered no testimony from the jail physician who is alleged to have treated Mr. Payne, either through live testimony, deposition, or affidavits.[3] The record contains an April 26, 2004 prescription for Mr. Payne for migraine medicine. Sergeant Marbry testified that sometimes Mr. Payne refused to take the medication because it was not working.

At the conclusion of the trial, the trial court took the matter under advisement. On May 20, 2013, the trial court entered a written order containing detailed findings of fact. The trial court determined that:

> Tipton County exercised ordinary and reasonable care with regard to [Mr. Payne's] healthcare. [Tipton County] had a policy that was adequate and followed [that] policy sufficiently. The defendant contracted with medical personnel who made the medical decisions in this case. When booked into jail in 2004, plaintiff considered himself healthy, and served some time before complaining of [a] headache. [Mr. Payne] complained of headaches and was treated as the records reflect, first with headache medications, and then with prescription medication from the doctor. Some of the medications were refused on April 28. On April 29 he was placed on observation. [Mr. Payne] indicated he was doing well and wanted to go back to the population. He stated on April 30 about 4:27 am that his head was still hurting. His blood pressure was [later] taken and

---

[3] The testimony of Sergeant Marbry and Officer Hartsfield were both introduced *via* deposition.

indicated 169/91. This is lower than when checked on his physical in 2003. At 8:50 he stated he was dizzy. He again requested to return to population at 9:04 am and was told he had to stay under observation. He complained of his vision which was checked about 9:30 am and he was transferred to the ER at that time. He was out to the ER by 9:56 am. The court finds that the jail personnel complied with their policy and with the requirements of due care of the inmate plaintiff and did not breach a duty of care and were not negligent.

Mr. Payne filed a timely notice of appeal.[4] While this appeal was pending, on January 11, 2014, Mr. Payne passed away. On March 4, 2014, Mr. Payne's father, John Payne, acting on behalf of Mr. Payne's minor children, filed a motion to substitute parties. The motion was granted on March 7, 2014.

## II. Standard of Review

We review the trial court's findings of fact *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law and our review is *de novo*. **Blair v. Brownson**, 197 S.W.3d 681, 684 (Tenn. 2006) (citing **Bowden v. Ward**, 27 S.W.3d 913, 916 (Tenn. 2000)). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. **4215 Harding Road Homeowners Ass'n. v. Harris**, 354 S.W.3d 296, 305 (Tenn. Ct. App. 2011); **Walker v. Sidney Gilreath & Assocs.**, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

## III. Analysis

Tipton County does not appear to dispute that Mr. Payne suffered a severe hypertensive crisis while he was in the custody of the Tipton County jail. Nor does Tipton County dispute that Mr. Payne had continuing injuries related to his severe hypertensive crisis. Tipton County, instead, disputes that any breach of duty on the part of Tipton County

---

[4] On June 26, 2013, Tipton County filed a motion for discretionary costs. Mr. Payne filed a response, but nothing in the record indicates that the trial court ruled on this motion. A motion for discretionary costs filed after a final order does not "arrest the finality" of the trial court's judgment. *See* **Graybeal v. Sherrod**, No. E2011-01825-COA-R3-CV, 2012 WL 4459807, at *9 (Tenn. Ct. App. Sept. 27, 2012) (citing **Roberts v. Roberts**, No. E2009-02350-COA-R3-CV, 2010 WL 4865441 at *8 (Tenn. Ct. App. Nov. 29, 2010)). Thus, despite the trial court's apparent failure to rule on this motion, this Court retains jurisdiction to consider this appeal. *See* Tenn. R. App. P. 3.

caused Mr. Payne's injuries. To support this argument, Tipton County asserts that the duty imposed on a jail to provide medical care is relatively low, and that nothing in the record preponderates against the trial court's finding that Tipton County did not breach that duty. Thus, as we perceive it, this case concerns one issue, namely: whether Tipton County breached its duty of care to Mr. Payne during his incarceration. We address that issue below.

As recently explained by the Tennessee Supreme Court:

> To prevail on a negligence claim, a plaintiff must prove the following elements: 1) a duty of care owed by the defendant to the plaintiff; 2) conduct falling below the applicable standard of care amounting to a breach of that duty; 3) an injury or loss; 4) causation in fact; and 5) proximate, or legal, cause. [*Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009)] Once duty and breach of duty have been established, and an injury presented, the plaintiff must establish causation.

*King v. Anderson County*, 419 S.W.3d 232, 246 (Tenn. 2013). With respect to the breach of duty element of a claim for negligence, our Supreme Court has held:

> Assuming a duty is owed, it must be determined whether defendant has exercised reasonable care under the circumstances. If defendant has not, the duty has been breached. In this regard, we have observed that "[t]he term reasonable care must be given meaning in relation to the circumstances. Ordinary, or reasonable, care is to be estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury."

*McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 895 (Tenn.1996) (citations omitted). Whether the defendants breached the duty of care is a question of fact that is entitled to presumption of correctness on appeal. *Hardeman County v. McIntyre*, --- S.W.3d ----, 2013 WL 1227034, at * 5 (Tenn. Ct. App. March 27, 2013) (citing *Winkler v. Pinnacle Properties I, LLC*, M2011-02616-COA-R3-CV, 2012 WL 2989135, *4 (Tenn. Ct. App. July 20, 2012)).

In order to determine whether Tipton County breached a duty of care to Mr. Payne, we must first determine what duty was owed to Mr. Payne while he was in Tipton County's custody. It is undisputed that "[p]rison officials have a duty to exercise ordinary and reasonable care for the protection of the persons in their custody." *Cockrum v. State*, 843 S.W.2d 433, 436 (Tenn. Ct. App. 1992) (citing *Kane v. State*, App. No. 89-75-II, 1989 WL

136963,at *2 (Tenn. Ct. App. Nov. 15, 1989)). However, "[p]rison officials are not insurers of a prisoner's safety." ***Cockrum***, 843 S.W.2d at 438. Instead, "their conduct must only be reasonably commensurate with the inmate's known condition." ***Id.*** (citing ***Stokes v. Leung***, 651 S.W.2d 704, 708 (Tenn. Ct. App. 1982)). "Except in the most obvious cases, whether the prison officials acted reasonably to protect a prisoner's safety requires expert proof or other supporting evidence." ***Cockrum***, 843 S.W.2d at 438 (citing ***Hughes v. District of Columbia***, 425 A.2d 1299, 1303 (D.C. Ct. App. 1981)). According to this Court:

> What duty is owed by the custodian to a prisoner? To treat him kindly; to provide him with clothing and adequate food; to provide him comfortable housing; **to arrange for medical treatment**; to protect him from violence and to prevent his escape.

***Mack v. Knox County***, No. C.A. 1293, 1989 WL 105653, at *2 (Tenn. Ct. App. 1989) (emphasis added) (citing ***Hale v. Johnston***, 140 Tenn. 1982 (Tenn. 1918)). "The state has the duty to make available to inmates a level of medical care which is reasonably designed to meet their routine and emergency health care needs, and states must provide medical care for inmates' physical ills, dental care, and psychological or psychiatric care." 60 Am. Jur. 2d Penal and Correctional Etc. § 99. More specifically, Tennessee Code Annotated Section 41-2-109 provides that:

> It is the duty of the superintendent to:
>
> (1) Discharge each prisoner as soon as the prisoner's time is out, or upon order of the board of commissioners;
> (2) See that the prisoners are properly guarded to prevent escape;
> (3) See that they are kindly and humanely treated, and properly provided with clothing, wholesome food properly cooked and prepared for eating three (3) times a day when at work;
> (4) See that they are warmly and comfortably housed at night and in bad weather;
> (5) **See that when sick they have proper medicine and medical treatment**, and, in case of death, are decently buried; and
> (6) Keep the males separate from the females.

***Id.*** (emphasis added). Thus, prison officials have a duty to ensure that inmates have access to proper medical treatment. Dr. Sobel, the only expert to testify on behalf of either party,

testified that the Tipton County's duty in this case was to provide first aid and "access" to medical care. Thus, we must next determine whether Tipton County breached that duty.

Tipton County appears to base its argument that jail officials provided Mr. Payne with access to medical care on its assertions that jail officers allowed Mr. Payne to be seen by a physician on April 26, 2004 and that jail officers followed all jail procedures throughout the events at issue in this case. We begin first with Tipton County's assertion that it provided medical access to Mr. Payne because he was seen by a jail physician on April 26, 2004. Mr. Payne denies that he was ever seen by a jail physician during his confinement. The trial court made no specific finding as to whether Mr. Payne was actually seen and examined by the jail physician at anytime between April 22, 2004 and April 30, 2004, when Mr. Payne was ultimately transported to the hospital. Where the trial court does not make findings of fact, there is no presumption of correctness and we "must conduct our own independent review of the record to determine where the preponderance of the evidence lies." ***Brooks v. Brooks***, 992 S.W.2d 403, 405 (Tenn. 1999). Based upon a thorough review of the record, we cannot agree with Tipton County that the evidence in the record preponderates in favor of Tipton County's assertion that Mr. Payne was "seen by the jail doctor."

The only evidence in the record that Tipton County asserts shows that Mr. Payne saw, and was examined by, a physician during his confinement is a request for medical attention form. There are several problems with this form, however. First, the request form contained in the record does not appear to be the original request for medical attention form created by Sergeant Marbry; instead, the record contains only a document that was originally in another inmate's file. Indeed, the information contained on the form regarding the date that the request was made is not accurate because it refers to the inmate to whom the form originally belonged, rather than Mr. Payne. Thus, we are unable to discern from the document when a request for medical attention was actually submitted on behalf of Mr. Payne.

The document contained in the record also purports to be signed by the jail physician diagnosing Mr. Payne with "Head Ache" and prescribing over-the-counter pain medication. However, Dr. Sobel testified that no physician or even nurse would misspell "headache." Therefore, Dr. Sobel testified that it was his belief that this form was not filled out by a medical professional. In addition, because the form actually belongs in another inmate's file, nothing in the record indicates that, even if the jail physician had examined Mr. Payne, the physician considered Mr. Payne's earlier physical exam in making a diagnosis. This information is especially important in this case because of Tipton County's unwritten policy to refuse to provide inmates with complete physicals upon booking if they had previously received a physical within the last year. This policy implies that the results of the prior physical would be considered in diagnosing a current inmate. Indeed, Captain Mitchell testified that it was jail policy that the results from prior physical "[would] be made part of

[an inmate's] medical file." As we perceive, the purpose of this policy would be to ensure that the inmate's medical records are available for consideration by the jail physician during any subsequent sick call. However, according to Dr. Sobel's expert testimony, there is no indication that Mr. Payne's prior high blood pressure results were ever considered with regard to the treatment he allegedly received while confined in the Tipton County jail. Again, Tipton County offered no testimony, from either an expert or a lay witness, to rebut Dr. Sobel's conclusion on this issue.

Further, no witness testified that he or she actually observed Mr. Payne being examined by the doctor. Instead, Sergeant Marbry testified that the jail doctor wrote the prescription for Mr. Payne without having examined him at all. Despite this testimony, Tipton County asserts that Mr. Payne was "seen" by the jail physician on April 26, 2004.[5] To be "seen" by a physician does not simply require that the jail physician write the patient a prescription without any kind of examination. As Dr. Sobel opined, the jail physician is required, at a minimum, to have face-to-face contact with the patient, and examine the patient based on his or her complaints. According to Dr. Sobel, in this situation, "proper . . . medical treatment" under Tennessee Code Annotated Section 41-2-109 would also require that the jail physician take the patient's blood pressure in this situation. Dr. Sobel's opinion on this issue is undisputed, as Tipton County offered no expert testimony to refute any of Dr. Sobel's testimony in this case.

The date of the form is unclear as well. It appears to state that Mr. Payne saw a physician or nurse on April 22, 2004, but Sergeant Marbry testified that she did not fill out a request for medical attention until at least April 26, 2004. No other officers testified that they either filled out or took completed medical attention request forms from Mr. Payne prior to April 26, 2004. Indeed, in its brief, Tipton County cites this form as evidence of its assertion that Mr. Payne saw a physician on April 26, 2004, rather than April 22, 2004. Nowhere in Tipton County's brief does it assert that Mr. Payne was "seen" or examined by the jail physician on April 22, 2004. Indeed, Tipton County asserts that Mr. Payne was "seen" by a jail physician "[a]fter a few days of complaining of headaches," rather than on April 22, 2004, the first day Mr. Payne lodged his complaint. Thus, the evidence regarding this form is inconsistent, and as such, the form is insufficient to establish, as Tipton County suggests, that Mr. Payne was examined by the jail physician on April 26, 2004.

Additionally, although the document purports to have Mr. Payne's signature and states that he saw the jail physician on the day it was signed (*i.e.*, April 22, 2004), Mr. Payne denied that the signature on the form was his. Mr. Payne submitted evidence of his signature on

---

[5] Although the medical request form appears to contain the date April 22, 2004, Tipton County only argues in its brief that Mr. Payne was "seen" by the jail physician on April 26, 2004.

other documents to show that the signature on the request for medical attention form did not belong to him. The trial court, as the trier of fact, was entitled to compare the signatures and draw any inferences therefrom. *See State v. Dedmon*, No. 01 C01-9506-CC-00209, 1996 WL 518274, at *4 (Tenn. Crim. App. Sept. 13, 1996) (citing Tennessee Rule of Evidence 901(b)(3)). However, the trial court made no specific findings as to whether the signature on the request for medical attention form actually belonged to Mr. Payne. From our review of the documents in the record, the signatures appear to be dissimilar.

Finally, regardless of whether he was seen by a doctor on April 22, 2004 or April 26, 2004, nothing on the form indicates that Mr. Payne's blood pressure was taken on either date. There is no evidence that any other jail officers took Mr. Payne's blood pressure at any time prior to April 30, 2004. Dr. Sobel testified that a jail is required to have jail officers on staff who can perform first aid and take blood pressure readings at all times. Indeed, testimony showed that the Tipton County jail had at least two officers who were able to take blood pressure readings without the presence of the jail physician. Further, Officer Hartsfield indicated that he knew what constituted an elevated blood pressure reading. Thus, the Tipton County jail had the ability to take Mr. Payne's blood pressure, but simply did not do so. Even Sergeant Marbry admitted that, when a complaint for a headache was coupled with blurred vision, the proper response is to "take [the inmate's] blood pressure . . . as soon as possible." However, it is undisputed that Tipton County failed to take Mr. Payne's blood pressure on April 29, 2004, when Mr. Payne undisputedly complained of blurred vision. Further, according to Dr. Sobel, none of Mr. Payne's other symptoms, including nausea or blurred vision, appear in the record to ever have been communicated to the jail physician. According to Dr. Sobel, even a lay person could recognize that these symptoms may be related to elevated blood pressure. According to Dr. Sobel's uncontroverted testimony, the failure to take Mr. Payne's blood pressure during the nine days leading up to his crisis was a breach of Tipton County's duty to provide access to medical care. Based on the evidence in the record, we cannot conclude that the evidence preponderates in favor of a finding that Mr. Payne was ever examined by a physician prior to being transported to the emergency room on April 30, 2003. According to Dr. Sobel's uncontroverted expert opinion, this was a breach of Tipton County's duty to provide access to proper medical treatment.

We recognize that some countervailing evidence exists on this issue. First, the initial physical performed on Mr. Payne in 2003 does not specifically indicate that Mr. Payne had "severe uncontrolled hypertension." Captain Mitchell further testified that neither he nor his staff would understand that the notation "HTN" referred to hypertension. Tipton County, thus, argues that it was not on notice that Mr. Payne could have been suffering from a hypertension related illness when he made his complaints. Officer Hartsfield, however, testified that when he took Mr. Payne's blood pressure on April 30, 2004, he was aware that a reading of 169/91 was elevated. The first blood pressure reading on the initial physical form was far higher;

accordingly, it may be inferred that some officers would have known that Mr. Payne had hypertension based on his prior physical, putting Tipton County on notice of Mr. Payne's condition.

Second, Mr. Payne indicated in his own intake that he did not suffer from high blood pressure. While this evidence is certainly not in Mr. Payne's favor, it does not prevent this Court from concluding that Tipton County breached its duty of care in this case. Although Mr. Payne may have erroneously indicated that he did not suffer from high blood pressure, Mr. Payne's physical in 2003 clearly indicated that he did. The purpose of the physical is to determine, and create a record, of whether the inmate suffers from any serious medical issues. Had Mr. Payne actually been appropriately examined by a jail physician, Dr. Sobel testified that this record should have been consulted. There is simply no evidence that the record created by Mr. Payne's earlier physical was ever considered. Here, the jail believed that an earlier physical was sufficient to meet the requirement that the jail provide medical access to inmates. If that is the case, then, the record of the earlier physical should have been consulted when Mr. Payne's condition deteriorated.

Third, at trial, Tipton County appeared to argue that Mr. Payne's own admitted drug use was a factor in his injuries. Dr. Sobel testified that Mr. Payne's hypertension was genetic, was not affected by his drug use, and that timely medical treatment could have prevented his injuries. Tipton County offered no expert testimony to rebut Dr. Sobel's opinions.

Finally, Tipton County asserts that Mr. Payne never complained of nausea or blurred vision prior to April 29, 2004, which symptoms Dr. Sobel states put Tipton County on notice that Mr. Payne's situation was worsening. However, the medical attention request form, which may have been completed on either April 22, 2004, or on April 26, 2004, states that Mr. Payne is suffering from "gastritis." "Gastritis" is defined as "an inflammation of the lining of the stomach." *Mosby's Medical, Nursing, and Allied Health Dictionary* 676 (5th ed. 1998). If this document was created on April 22, 2004, or even April 26, 2004, as Tipton County asserts, Mr. Payne must have informed some jail officers of his nausea prior to April 29, 2004. Indeed, Mr. Payne testified that he complained of nausea as early as April 22, 2004. Thus, while we recognize that the record contains several inconsistencies, many are the result of inconsistencies in the Tipton County jail's own records. Consequently, we cannot conclude that these inconsistencies require this Court to hold that Tipton County must prevail in this case.

Tipton County next argues that it did not breach the duty of care because it followed all jail procedures. Tennessee Courts have previously held that a jail facility did not breach the duty of care when it followed its own procedures relative to medical care. *See Manus v. Sudbury*, No. W2003-00447-COA-R3-CV, 2003 WL 22888883, at *4 (Tenn. Ct. App. Dec.

3, 2003) (looking at whether jail procedures were followed to determine if a duty had been breached). Indeed, the trial court based its determination that Tipton County did not breach the duty of care on its finding that Tipton County followed all applicable procedures. Respectfully, we disagree and, instead, conclude that the evidence preponderates against the trial court's finding that Tipton County followed its own procedures. The record in this case contains the Rules of Tennessee Corrections Institute, Minimum Standards for Local Correctional Facilities (hereinafter "Minimum Standards"). The purpose of these rules are to "establish minimum standards for local jails, lock-ups, workhouses and detention facilities." There is no dispute that the minimum standards contained therein are applicable to the Tipton County jail and that local jails are only allowed to alter the standard if the changed standards "meet or exceed and do not conflict with the standards established and recorded [there]in." With regard to an initial physical, the Minimum Standards require:

> A more complete examination shall be completed on prisoners within fourteen (14) days of their initial confinement date. This examination shall be performed by a physician or a person who has been designated by a physician as capable of performing such examination. If a designee performs the examination he/she must do so under supervision of a physician and with a protocol or set of instructions and guidelines from the physician.

This requirement is the exact requirement contained in Tipton County's own Tipton County Correctional Facility Policy and Procedure Manual. However, according to several witnesses, Tipton County did not follow this standard, as it had an unwritten policy of waiving the physical exam if the inmate had previously been incarcerated, and had undergone a physical exam, within the past year. Indeed, it is undisputed in this case that Mr. Payne did not undergo a physical within fourteen days of his booking on March 1, 2004. Nothing in the Minimum Standards, however, allows jail staff to forego a complete physical examination within fourteen days of booking if the inmate has previously received a physical examination within the last year. Accordingly, regardless of whether this was official Tipton County jail policy at the time of Mr. Payne's March 1, 2004 arrest, Tipton County was simply not able to set a standard regarding a physical that did not at least "meet or exceed and d[id] not conflict with the standards established and recorded" in the Minimum Standards. Consequently, in failing to perform a physical on Mr. Payne within fourteen days of his booking in March 2004, approximately seven months after his previous physical, Tipton County failed to meet the Minimum Standards set by the Tennessee Department of Correction.

Further, Tipton County does not appear to have followed its own procedures regarding sick call. The Tipton County Correctional Facility Policy and Procedure Manual ("the Manual") outlines the procedure for sick call, whereby an inmate may ask to be seen by the

jail physician. In the Manual, after a sick call request is submitted, the jail physician will review and triage the sick call requests. The jail physician will then:

> [C]onduct an examination of the inmate. The illness will be diagnosed and if over the counter medication will correct the problem, prescribe to the inmate. If the condition warrants a doctor and is not an emergency, the facility physician will refer the inmate to the facility doctor or schedule or recommend an appointment be scheduled for the inmate, with the contracting medical facility.

*   *   *

> g. Upon completing Sick Call, the medical records will be given to the Shift Supervisor for placement in the inmate's medical file.

In this case, a sick call request was made. As previously discussed, however, the evidence in the record supports a finding that Mr. Payne was never actually "examin[ed]" by the jail physician or that his "illness" was "diagnosed." *Black's Law Dictionary* defines "diagnose" as "[t]he art or act of recognizing the presence of disease from its symptoms, and deciding as to its character," and indicates that this act involves "discover[ing] the source of a patient's illness[.]" *Black's Law Dictionary* 408 (5th ed. 1979). Even if we were to accept Tipton County's assertion that Mr. Payne was examined by the jail physician, nothing in the record indicates that the jail physician attempted to discern the underlying cause of Mr. Payne's symptoms. According to Dr. Sobel, a simple "common sense" blood pressure reading would have exposed the cause of Mr. Payne's symptoms. In addition, the record about the alleged examination was not placed in Mr. Payne's inmate file, but was originally placed in another inmate's file. Both of these actions were in clear violation of the above policy. Thus, the trial court erred in finding that Tipton County followed its own procedures with regard to the events at issue in this case.

Based on the undisputed testimony of Dr. Sobel, we conclude that the evidence in the record was sufficient to establish that Tipton County breached the duty of care by failing to provide Mr. Payne access to proper medical treatment during his confinement, specifically by (1) failing to give Mr. Payne a physical within fourteen days of his confinement, as required by the Minimum Standards; (2) failing to consider the results of the earlier physical at anytime after Mr. Payne began exhibiting symptoms; (3) failing to ensure that Mr. Payne was examined and diagnosed by a physician at anytime during his confinement once he began to exhibit symptoms, as required by Tipton County's own Manual; and (4) failing to take Mr. Payne's blood pressure at anytime prior to April 30, 2004, despite the fact that Tipton County

officers were able to perform that function. Tipton County offered no expert testimony to rebut any of Dr. Sobel's assertions. Based on this evidence, we conclude that the evidence in the record preponderates against the trial court's finding that Tipton County did not breach the duty of care with regard to Mr. Payne.

Based on the foregoing analysis, we reverse the trial court's finding that Tipton County did not breach the duty of care in this case. This cause is remanded for a determination of damages and all other proceedings as are necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellee Tipton County, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE